**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE FLASHCOM, INC. | Case No. SA CV 11-1883 FMO |
| CAROLYN A. DYE, TRUSTEE, | Case No. ED CV 13-0114 FMO |
| Appellant, | |
| v. | **ORDER Re: BANKRUPTCY APPEALS** |
| COMMUNICATIONS VENTURES III, LP, et al., | |
| Appellees; | |
| DAVID R. WEINSTEIN, et al., | |
| Appellants, | |
| v. | |
| COMMUNICATIONS VENTURES III, LP, et al., | |
| Appellees. | |

**<u>INTRODUCTION</u>**

Before the court are two related appeals from the bankruptcy matter, <u>In re Flashcom, Inc.,</u> (bankruptcy court Case No. 8:00-bk-19215 RK, Adversary No. 8:02-ap-1620 RK; bankruptcy court Case No. 2:12-bk-16351 RK, Adversary No. 2:12-ap-1339 RK). In the first case, Flashcom, Inc.'s

("Flashcom" or "the debtor") Trustee, Carolyn A. Dye ("Dye," or "the Trustee") challenges several of the bankruptcy court's pre-trial orders and findings at trial in favor of Communications Ventures III, LP; Communications Ventures III CEO & Entrepreneurs' Funds, LP; Mayfield IX; Mayfield Associates Funds IV; David Helfrich; the Estate of Todd Brooks; Richard Rasmus; and Kevin Fong, (collectively, "appellees"). (See Dye's Opening Brief in Case No. SA CV 11-1883 ("Dye Opening Brief"), at 1-4). In the second case, the Trustee and her counsel, David R. Weinstein ("Weinstein"), appeal from the bankruptcy court's order imposing sanctions of $60,000 against them relating to a motion in limine they filed, which argued that the stipulated judgment rendered any trial unnecessary. (See Weinstein and Dye's Opening Brief in Case No. ED CV 13-0114 ("Weinstein Opening Brief"), at 1-2).

These cases raise overlapping issues and the court finds it appropriate to consider the two appeals together. Further, having reviewed and considered all the briefing filed with respect to both cases, the court concludes that oral argument is not necessary to resolve the appeals. See Fed. R. Civ. P. 78; Local Rule 7-15; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001).

## STATEMENT OF FACTS

Flashcom was an internet service provider founded in the late 1990s by Andra Sachs ("Andra") and Brad Sachs ("Brad"), which was involved in reselling DSL (digital subscriber line) service to consumers and business users. (See Excerpts of Record, Case No. SA CV 11-1883 ("ER1") at 11319-29 (Admitted Facts in Joint Pre-Trial Order ("AF")) at ¶¶ 1, 4 & 5). The VC Funds[1] made their initial investment in Flashcom in June 1999 by paying $15,000,000 to purchase Series A Preferred Stock. (See id. at ¶ 17). As a result, the VC Funds appointed partners to Flashcom's Board of Directors; ComVentures appointed David Helfrich and Mayfield appointed Todd Brooks and Kevin Fong (collectively, the "director defendants"). (See id.). Flashcom's Board

---

[1] The VC Funds are comprised of Communications Ventures III, LP; Communications Ventures III CEO & Entrepreneurs' Funds, LP, (collectively, "ComVentures"); Mayfield IX; and Mayfield Associates Funds IV (collectively, "Mayfield").

was comprised of five directors, i.e., the three director defendants plus Andra and Brad. (See id. at ¶ 4, 5 & 17).

When the director defendants joined the Board, they began to have concerns about Andra's continuing involvement with Flashcom. (See AF at ¶ 18). On July 27, 1999, the Board informed Andra that her management style could no longer be tolerated because it was hindering relations with customers, strategic partners, and vendors. (See id. at ¶ 19). Accordingly, the Board determined that it was necessary to remove Andra from the management of Flashcom. (See id.).

However, Andra refused to voluntarily remove herself from management absent a substantial payment. (See AF at ¶ 19). Flashcom contemplated a second round of financing to raise funds, but because the financing had not yet begun, Flashcom was unable to pay the amount needed to remove Andra. (See id.).

To end Andra's day-to-day involvement in Flashcom, Andra and the VC Funds executed a Loan and Pledge Agreement. (See AF at ¶ 20; ER1 at 22572-99). Although structured as loans, the Loan and Pledge Agreement was an agreement under which the VC Funds would pay Andra $1,000,000 and, in the event Flashcom completed a Series B "Qualified Financing" by obtaining at least $30 million with venture capital and other institutional investors ("the Financing Condition"), the VC funds "and/or other investors in the Qualified Financing" would purchase Andra's stock for $9,000,000 as part of a "Unit Purchase," which would consist of a combination of Andra's common stock and the Series B Preferred Stock. (See AF at ¶¶ 20 & 27; ER1 at 22572). If Flashcom completed the Qualified Financing, but the other investors decided not to participate in the purchase of Andra's stock, the VC Funds were obligated to purchase Andra's stock themselves. (See id.). In exchange, Andra would withdraw from Flashcom's operations. (See AF at ¶ 20).

In connection with the anticipated Series B financing, Flashcom retained Thomas Weisel Partners ("TWP") as its investment banker. (See AF at ¶ 23). TWP assisted Flashcom in preparing a Private Placement Memorandum ("PPM") by which Flashcom offered the Series B Preferred Stock. (See id. at ¶¶ 22 & 24). In late 1999, TWP recommended that instead of marketing a "Unit Purchase," Flashcom use a simpler approach whereby Series B investors would purchase only one security, the Series B Preferred Stock, and then Flashcom would pay Andra

1   $9,000,000 with money it received from the Series B financing.  (See id. at ¶ 27).  As such,

2   pursuant to the PPM, Flashcom offered $40 million of Series B preferred stock, with the

3   understanding that $9,000,000 of the proceeds would be used to purchase Andra's stock.  (See

4   id. at ¶¶ 22 & 28).

5          To implement the Series B financing, Flashcom prepared a Series B Preferred Stock

6   Purchase Agreement (the "Series B Agreement").  (See id. at ¶ 26; ER1 at 22819-95).  In addition,

7   to provide Flashcom with short-term working capital and to sustain its operations prior to the

8   Series B financing, the VC Funds made a series of "Bridge Loans" to Flashcom, totaling

9   approximately $9,000,000.  (See AF at ¶ 25).

10         By December 1999, Andra had threatened litigation against Flashcom, the VC Funds, the

11  director defendants, Brad, and other representatives of Flashcom's Board and management.  (See

12  AF at ¶ 29).  Andra's counsel had prepared and signed a complaint on her behalf asserting several

13  claims, including breach of fiduciary duty and fraud, which was submitted to the news media but

14  not filed in court.  (See id.; ER1 at 02501-12).  Flashcom's Board and management were

15  concerned that any threatened or actual litigation by Andra, irrespective of its merits, would

16  prevent or impair the completion of the Series B financing.  (See Memorandum Decision Re: Third

17  and Eighth Causes of Action of Plaintiff's Amended Complaint, filed on September 23, 2011

18  ("Court's Order of September 23, 2011") at 13).  For example, the lead Series B investor indicated

19  that it would not go forward with investing in the Series B transaction unless all disputes between

20  Andra and Flashcom were resolved and Andra provided a release of all claims against Flashcom,

21  its directors and officers, and the VC Funds.  (See id.).

22         On or about February 11, 2000, the VC Funds, Andra, and Flashcom executed a Stock

23  Purchase Agreement.  (See AF at ¶ 31; ER1 at 22708-17).  Pursuant to this Agreement, Andra

24  agreed to sell some of her common stock to the VC Funds in exchange for $1,000,000, and the

25  sale was deemed accomplished by the payment already made by the VC Funds in connection with

26  the Loan and Pledge Agreement.  (See AF at ¶ 31; ER1 at 22708).  Also under the Agreement,

27  Flashcom agreed to repurchase some of Andra's common stock for $9,000,000, conditioned on

28  satisfaction of the Financing Condition for the Series B offering.  (See id.).

4

Concurrently with the Stock Purchase Agreement, Flashcom, the director defendants, the VC Funds, and Andra executed a Settlement Agreement and Release (the "Release").  (See AF at ¶ 34; ER1 at 22680-96).  In exchange for the $9,000,000 payment to Andra provided for in the Stock Purchase Agreement, Andra agreed to release all claims against Flashcom, Brad, and appellees.  (See AF at ¶ 34; ER1 at 22682).  By virtue of the terms of the Series B Agreement, the Release, the Stock Purchase Agreement, and their respective exhibits, (1) the settlement with Andra was a condition to closing the Series B financing; (2) closing the Series B financing was a condition to the Stock Purchase Agreement and Flashcom's payment of $9,000,000 to Andra; and (3) effectuation of the Stock Purchase Agreement and payment of $9,000,000 by Flashcom to Andra was a condition to the settlement with Andra.  (See AF at ¶ 37).

By February 23, 2000, the Financing Condition was satisfied.  (See AF at ¶ 39).  The Series B offering had originally contemplated raising only $40 million, but it was oversubscribed due to interest in Flashcom and instead raised $84 million.  (See Court's Order of September 23, 2011, at 15).  Flashcom could have raised even more funds, but the Board decided to close the offering at $84 million to prevent dilution in advance of an anticipated initial public offering ("IPO").  (See id.).  Also on February 23, 2000, Flashcom repurchased Andra's stock and paid her $9,000,000 through a wire transfer.  (See AF at ¶¶ 40-41).  After Flashcom paid Andra the $9,000,000, Andra never demanded payment from the VC Funds, and they never offered to make payments on account of the Loan and Pledge Agreement.  (See id. at ¶¶ 43-44).  Thus, the Series B financing yielded $75 million for Flashcom following its payment to Andra.

Flashcom met with several investment banks about its anticipated IPO, (see ER1 at 03672), but by the time Flashcom filed a SEC Form S-1 registration statement with the Securities and Exchange Commission on May 12, 2000, the market in the telecom industry had changed dramatically.  (See id. at 19890).  Flashcom's management determined that a better approach would be to obtain additional private financing to meet Flashcom's needs for the next few months, and then pursue the IPO at a later date.  (See id. at 19891).  However, the downturn in the economy made it difficult to obtain the additional financing, and Flashcom was forced to file for bankruptcy on December 8, 2000.  (See id.).

1    The Trustee filed suit on July 19, 2002, asserting various claims against Andra, Brad, and

2    appellees.  (See ER1 at 00001-25).  On May 4, 2004, appellees moved for partial summary

3    judgment.  (See id. at 02226-87).  On July 28, 2004, the bankruptcy court granted the motion as

4    to the fraudulent transfer claims under 11 U.S.C. § 548 and Cal. Civ. Code § 3439.04(a), claims

5    under Delaware Corporations Law §§ 140, 170, and 173, and claims for breach of fiduciary duty,

6    negligence, and corporate waste under Delaware law.[2]  (See id. at 06854-92).  The two claims

7    remaining for trial were (1) avoidance of preferential transfer under 11 U.S.C. § 547(b); and (2)

8    impairment of capital under Delaware General Corporation Law § 160.  (See id. at 19870-910).

9    In September 2005, the Trustee entered into a Settlement Agreement with Andra and Brad.

10   (See ER1 at 20091-109).  The Settlement Agreement provided that "[w]ithout admitting any

11   liability, and in furtherance of this settlement, Andra shall consent to entry of a judgment for the

12   avoidance of preferential transfers in the principal amount of $9,000,000 under 11 U.S.C.

13   547(b)[.]"  (Id. at 20099).  In exchange, the Trustee would recover either $50,000 or $62,500 from

14   Andra, depending on whether the Trustee recovered more than $2,000,000 from appellees within

15   36 months of the settlement's approval.  (See id. at 20100-01).  The Settlement Agreement further

16   provided that "[n]othing contained in this Agreement shall be deemed to be or construed to be an

17   admission as to the truthfulness or validity of any factual allegations, claims, defenses, assertions

18   or causes of action[.]"  (See id. at 20106).

19   After notice and a hearing at which appellees were present, the bankruptcy court approved

20   the Settlement Agreement.   (See ER1 at 08708-09; 20323-46).  On August 2, 2006, the

21   bankruptcy court entered the stipulated judgment contemplated by the Settlement Agreement.

22   (See id. at 07271-78).  The stipulated judgment provided that Flashcom's transfer of $9,000,000,

23   "which was a transfer made for the benefit of Andra Sachs, is avoided as a preferential transfer

24   pursuant to 11 U.S.C. § 547(b)."  (Id. at 07272).

25

26      [2]    In the bankruptcy court's Memorandum Decision and Order of July 28, 2004, it granted
appellees' motion on the fraudulent transfer claims, with the exception of constructive fraud under
27   California law.  (See Court's Order of July 28, 2004, at 2).  However, following additional briefing,
the bankruptcy court subsequently granted summary judgment on that claim in favor of appellees,
28   in an order which is not being appealed.  (See ER1 at 07239-40).

The Trustee moved for partial summary judgment on August 25, 2006, seeking to establish the liability of appellees for the $9,000,000 transfer.  (See ER1 at 07287-305).  She argued that under the terms of the stipulated judgment, avoidability of the transfer as a preferential transfer under 11 U.S.C. § 547(b) was already established, and since appellees were persons for whose benefit the transfer was made under 11 U.S.C. § 550, the bankruptcy court should enter an order for the recovery of the $9,000,000 transfer from appellees.  (See id.).  On February 5, 2007, the bankruptcy court denied the Trustee's motion, holding that the entry of the stipulated judgment did not avoid the transfer and that appellees had a Fifth Amendment due process right to defend the claims against them before they could be deprived of their property.  See In re Flashcom, Inc., 361 B.R. 519, 525-26 (Bankr. C.D. Cal. 2007).

Dissatisfied with this decision, the Trustee sought reconsideration of the bankruptcy court's Order of February 5, 2007.  (See ER1 09157-71).  The bankruptcy court denied this request, stating that the Trustee "ha[d] not demonstrated that the court's prior ruling denying [the Trustee's] prior summary judgment motion on grounds that [appellees] have a constitutional due process right to defend [the Trustee's] 11 U.S.C. § 547 claims against them was legally erroneous."  (Id. at 10043).

On August 31, 2007, the Trustee requested leave to file an interlocutory appeal to this court.  (See Excerpts of Record for ED CV 13-0114 ("ER2") at 02896-933).  On October 29, 2007, this court denied leave, noting that there was "no substantial ground for a difference of opinion that warrants granting an interlocutory appeal."  (See id. at 13975).  The Trustee sought reconsideration of this court's denial of leave to prosecute an interlocutory appeal, (see id. at 13978-4010), which was denied on November 26, 2007.  (See id. at 14032-33).

Prior to trial, the Trustee filed a motion in limine seeking to preclude appellees from introducing evidence concerning the avoidability of the $9,000,000 transfer and requesting that the court enter judgment against appellees.  (See ER2 at 06961-95).  On October 9, 2008, appellees filed a motion for sanctions pursuant to Federal Rule of Bankruptcy Procedure 9011, arguing that the motion in limine constituted an improper fifth attempt to relitigate the court's decision that the stipulated judgment did not preclude appellees from contesting the avoidability

1  of the transfer.  (See id. at 08144-64).  The bankruptcy court deferred ruling on both the motion

2  in limine and the motion for sanctions until after the conclusion of the trial.  (See id. at 14316-18).

3  The Trustee also filed a motion to exclude the expert reports of Randy Sugarman ("Sugarman"),

4  (see ER1 at 10577-600), and to strike the expert report of Gary Hagmueller ("Hagmueller").  (See

5  id. at 12598).  However, the bankruptcy court decided to consider their reports and testimony.

6  (See id. at 19863-69 & 22201-03).

7  Trial on the remaining claims commenced on November 13, 2008.  (See Court's Order of

8  September 23, 2011, at 2).  Post-trial briefing was filed in March 2009, (see id. at 3), and the

9  bankruptcy court issued its memorandum decision on September 23, 2011, finding in favor of

10  appellees on all issues.  (See, generally, id.).

11  On October 26, 2011, appellees renewed their motion for sanctions related to the Trustee's

12  motion in limine, which had never been ruled on.  (See ER2 at 08718-22).  After further briefing,

13  the bankruptcy judge heard oral argument and indicated that he would grant the motion.  (See id.

14  at 09086-134).  On January 24, 2012, appellees filed a supplemental brief requesting sanctions

15  in the amount of $97,047 ($35,183 incurred in connection with the motion in limine and $61,864

16  incurred in connection with the motion for sanctions).  (See id. at 09028-85).  On October 22,

17  2012, the bankruptcy court issued an order granting appellees' motion and imposing sanctions of

18  $60,000 on Dye and Weinstein, jointly and severally, and set forth its reasoning in a decision

19  issued on October 11, 2012.  (See id. at 09833-57).

20  ## STANDARD OF REVIEW

21  When reviewing a bankruptcy court's decision, " 'a district court functions as [an] appellate

22  court and applies the standard of review generally applied in federal court appeals.' " In re Crystal

23  Props., Ltd., L.P., 268 F.3d 743, 755 (9th Cir. 2001) (quoting In re Webb, 954 F.2d 1102, 1103-04

24  (5th Cir. 1992)).  "A district court reviews a bankruptcy court's conclusions of law and interpretation

25  of the Bankruptcy Code de novo."  In re Orange County Nursery, Inc., 439 B.R. 144, 148 (C.D.

26  Cal. 2010).  Factual findings are reviewed for clear error, and the court "must accept the

27  bankruptcy court's factual findings unless, upon review, the court is left with the definite and firm

28  conviction that a mistake has been committed by the bankruptcy judge."  In re Greene, 583 F.3d

1 | 614, 618 (9th Cir. 2009); see Fed. R. Bankr. P. 8013 ("Findings of fact, whether based on oral or
2 | documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be
3 | given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.").

4 | "[T]he bankruptcy court's evidentiary rulings [are reviewed] for an abuse of discretion."
5 | Latman v. Burdette, 366 F.3d 774, 786 (9th Cir. 2004).  "To reverse on the basis of an erroneous
6 | evidentiary ruling, [the court] must conclude both that the bankruptcy court abused its discretion
7 | and that the error was prejudicial."  Id.  On appeal, the district court "may affirm, modify, or reverse
8 | a bankruptcy judge's judgment, order, or decree or remand with instructions for further
9 | proceedings."  Fed. R. Bankr. P. 8013.  The district court may affirm a bankruptcy court's order
10 | "on any ground supported by the record, even if it differs from the ground relied upon by the
11 | bankruptcy court."  Thrifty Oil Co. v. Bank of Am. Nat. Trust and Sav. Ass'n, 322 F.3d 1039, 1046
12 | (9th Cir. 2002).

13 | With these standards in mind, the court now turns to the arguments raised by the parties.

14 | **DISCUSSION**

15 | I.  EFFECT OF THE STIPULATED JUDGMENT ON THE AVOIDABILITY DETERMINATION.

16 | A.  Due Process

17 | Section 547(b) of the Bankruptcy Code "permits the trustee in bankruptcy to avoid certain
18 | prepetition transfers of property interests of the debtor" made to or for the benefit of a creditor.
19 | In re Sufolla, Inc., 2 F.3d 977, 979 (9th Cir. 1993), superseded by statute on other grounds; see
20 | 11 U.S.C. § 547(b).  Once the elements of § 547(b) are satisfied and it has been determined that
21 | the transfer is avoidable, "§ 550(a) then identifies the party responsible for repayment of the
22 | preference."  Sufolla, 2 F.3d at 980; see Levit v. Ingersoll Rand Fin. Corp., 874 F.2d 1186, 1194
23 | (7th Cir. 1989), superseded by statute on other grounds, ("After § 547 defines which transfers are
24 | avoidable, § 550(a) identifies who is responsible for payment[.]").  Section 550(a) provides that
25 | to the extent that a transfer is avoided under section 544, 545, 547, 548, 549,
26 | 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the
27 | estate, the property transferred, or, if the court so orders, the value of such
28 | property, from . . . (1) the initial transferee of such transfer or the entity for

9

1    whose benefit such transfer was made; or (2) any immediate or mediate

2    transferee of such initial transferee.

3    11 U.S.C. § 550(a).

4    The Trustee argues that once the stipulated judgment was entered, the $9,000,000 transfer

5    was avoided once and for all.  (See Dye Opening Brief at 13-21).  She maintains that because

6    "avoidability is a characteristic of a transfer that is determined separately from who is liable to

7    return the value of the transfer," (id. at 13), appellees could no longer assert after entry of the

8    stipulated judgment that the transfer was not avoidable under § 547(b); they were limited to

9    arguing that they were not benefitted parties under § 550(a).  (See id. at 13-20).  As such, the

10   Trustee contends that the court lacked jurisdiction over the trial on the § 547(b) claim and that the

11   stipulated judgment constitutes a final judgment on the issue of avoidability, which was precluded

12   from reconsideration by the doctrine of res judicata.  (See id. at 15-17).  The Trustee's contentions

13   are unpersuasive.

14   The stipulated judgment was entered into between Andra and the Trustee.  (See ER1 at

15   07271-78).  Appellees were not a party to the stipulated judgment or Settlement Agreement

16   between the Trustee and Andra.  (See id. at 20091-109).  That appellees were notified and did not

17   object to the Settlement Agreement (see Dye's Reply Brief in SA CV 11-1883 ("Dye Reply") at 12-

18   18), does not mean that appellees are bound by the stipulated judgment.[3]  The Trustee has sued

19   appellees to recover $9,000,000 and it strains credulity to argue that the appellees are bound by

20   the stipulated judgment.[4]  Nonsettling defendants should not be bound by a settlement in which

21   they took no part.  In short, it cannot be said that appellees have had an opportunity to be heard

22

23   [3] As the bankruptcy court noted, "[the Trustee] indicated that approval of the Global Settlement

24   Agreement would not affect her claims against [appellees,]" and that "neither the court nor
     [appellees] were aware of [the Trustee's] intent to use the Stipulated Judgment to terminate

25   [appellees'] right to litigate the preference claim[.]"  Flashcom, 361 B.R. at 526.

26   [4] Indeed, the Trustee's willingness to advance any argument, irrespective of its merits, is
     demonstrated by the fact that the Trustee at one point in the litigation argued that appellees had

27   no standing to challenge the stipulated judgment.  (See ER1 at 08591).  It is disingenuous to argue
     that appellees are bound by the stipulated judgment, (see Dye Opening Brief at 9-12), and also

28   argue that they have no standing to challenge it.  (See ER1 at 08591).

1    "in a meaningful manner" consistent with due process.  <u>Fuentes v. Shevin</u>, 407 U.S. 67, 80, 92

2    S.Ct. 1983, 1994 (1972).  Nor can it be said that the bankruptcy court lacked jurisdiction to

3    convene the trial and enter judgment on the remaining claims against appellees.  <u>See</u>, <u>e.g.</u>, <u>In re</u>

4    <u>Cement and Concrete Antitrust Litig.</u>,1981 WL 2039, *5 (D. Ariz. 1981) (entering final judgment

5    as to settling defendants in accordance with settlement agreement while retaining jurisdiction as

6    to non-settling defendants).

7         The fact that appellees were not parties to the Settlement Agreement undermines the

8    Trustee's assertion, (<u>see</u> Dye Opening Brief, at 16-18), that the stipulated judgment is <u>res judicata</u>

9    as to avoidability.  "[T]he doctrine of <u>res judicata</u> provides that a final judgment on the merits bars

10   further claims by parties or their privies based on the same cause of action[.]"  <u>Hells Canyon Pres.</u>

11   <u>Council v. U.S. Forest Serv.</u>, 403 F.3d 683, 686 (9th Cir. 2005) (citation omitted).  "The elements

12   necessary to establish <u>res judicata</u> are: (1) an identity of claims, (2) a final judgment on the merits,

13   and (3) privity between parties."  <u>Id.</u> (internal quotation marks and citation omitted).

14        As noted earlier, appellees were not parties to the stipulated judgment, were not involved

15   in the settlement negotiations, and did not control any party participating in the Settlement

16   Agreement.  (<u>See</u> ER1 at 07271-78 & 22680-96; appellees' Opening Brief in SA CV 11-1883 ("Dye

17   Opposition") at 15).  "Parties who choose to resolve litigation through settlement may not dispose

18   of the claims of a third party . . . without that party's agreement."  <u>Local No. 93, Int'l Ass'n of</u>

19   <u>Firefighters, AFL-CIO C.L.C. v. City of Cleveland</u>, 478 U.S. 501, 529, 106 S.Ct. 3063, 3079 (1986);

20   <u>see</u> <u>E.E.O.C. v. Pan Am. World Airways, Inc.</u>, 897 F.2d 1499, 1506 (9th Cir.), <u>cert. denied</u>, 498

21   U.S. 815 (1990) (A settlement "cannot prejudice the rights of persons who are strangers to the

22   proceeding, even though they may have actual knowledge of the settlement or the underlying

23   litigation.").

24        Moreover, there was no final judgment on the merits of the avoidability claim as to

25   appellees.  As an initial matter, the underlying Settlement Agreement makes it clear that the

26   Trustee and Andra were not stipulating to a judgment on the merits.  The Settlement Agreement

27   underlying the stipulated judgment states that "[n]othing contained in this Agreement shall be

28   deemed to be or construed to be an admission as to the truthfulness or validity of any factual

allegations, claims, defenses, assertions or causes of action[.]"  (ER1 at 20106).  Even if the stipulated judgment could be construed as a final judgment on the merits, it would only apply to Andra and the Trustee, as they were the only parties that signed Settlement Agreement and stipulated judgment.  (See ER1 at 07273-74); Federal Trade Commission v. Garvey, 383 F.3d 891, 897-98 (9th Cir. 2004) (although a settlement may be a final judgment on the merits, that settlement could not bar claims where there was no privity).

In an effort to avoid the plainly obvious deficiencies with its res judicata argument, the Trustee asserts that who may be liable "is a completely separate concept" from whether the transfer is avoidable.[5]  (See Dye Opening Brief at 17) (citing In re Crafts Plus+, Inc., 220 B.R. 331, 338 (W.D. Tex. 1998) ("§ 547 focuses exclusively on the transfer, not the creditor or beneficiary. Once it has been established that a qualified transfer has been made, § 550 provides for recovery against either the initial transferee . . . or the entity for whose benefit such transfer was made[.]") (internal quotation marks omitted)).  While it is true that "there is a distinction between avoiding the transaction and actually recovering the property or the value thereof," In re Int'l Admin. Servs., Inc., 408 F.3d 689, 703 (11th Cir. 2005), the bankruptcy court was correct that "neither the Code nor the Rules specify whether a § 550(a) transferee has the right to litigate and/or raise defenses to the avoidability of a transfer as a preference."  Flashcom, 361 B.R. at 523; see In re Laguna Beach Motors, Inc., 148 B.R. 317, 320 n. 4 (9th Cir. 1992) (noting that the statutory language contains no limitation on who can raise a defense to avoidability under § 547(c)(1) and that "if a valid § 547(c)(1) defense to avoidability exists, there can be no recovery from [the transferee] under § 550(a)").

---

[5]    The Trustee also argues that even if the judgment that the transfer was avoided was legally wrong, it is still enforceable because "[a] judgment is not void . . . simply because it is or may have been erroneous."  United Student Aid Funds, Inc. v. Espinosa, 559 U.S. 260, 270, 130 S.Ct. 1367, 1377 (2010); (see Dye Opening Brief at 10 & 17-20).  However, this argument misses the point. Appellees do not seek to void the stipulated judgment; its edicts are still enforceable upon those who were party to it.  The stipulated judgment simply had no effect upon appellees' right to challenge avoidability.  In contrast, Andra could not challenge avoidability without seeking to void the stipulated judgment because she was a party to it.

Many courts, including some that have relied on the underlying decision of the distinguished bankruptcy judge in this matter, have concluded that a stipulated or default judgment in an avoidance action does not preclude the defendants in a recovery action from disputing the avoidability of the transfer and raising appropriate defenses.  For example, in In re Jones Storage & Moving, Inc., 2005 WL 2590385 (Bankr. D. Kan. 2005), the court pointed to the very circumstances at issue here to demonstrate the undesirable outcomes to which the Trustee's argument would lead.  "[W]henever multiple parties are involved in a transaction voidable under the Code, the trustee could select one party, obtain a stipulated avoidance judgment against that party (perhaps with an agreement not to collect the judgment against the cooperating party), then seek to collect the balance from the other parties under section 550, irrespective of the defenses the parties might have had to the avoidance in the first place."  Id. at *4.

Similarly, in In re Food & Fibre Prot., Ltd., 168 B.R. 408 (Bankr. D. Ariz. 1994), a default judgment was entered against two defendants on the trustee's § 547(b) claim.  See id. at 415.  The trustee argued that due to the default judgment, he "need not prove that the transfer . . . was a preference, but need only show that [the remaining defendant was] a transferee against whom recovery is appropriate under Section 550."  Id.  Like the Trustee here, the trustee in that case "emphasized the separation of the concepts of avoidance and recovery" and asserted that, because of the default judgment, the transfer was avoided.  Id.  The court found that "this proposition, . . . on its face, appears to contradict due process" and noted that the application of this rule "could lead to anomalous and unfair results."  Id. at 415-16.  The court "reject[ed] this theory as unsupported" and held that "[s]ince [the co-defendants'] default did not involve [the remaining defendant], the Trustee must establish that it is proper to avoid the transfer" and then establish that payment could be recovered from the remaining defendant under § 550.  Id. at 416.  Finally, several other cases, which have relied on the underlying case, have also held similarly.  See, e.g., Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 480 B.R. 501, 521-22 (Bankr. S.D.N.Y. 2012) (holding that a trustee may settle with an initial transferee and still pursue recovery against a subsequent transferee, but "notwithstanding, the Trustee will still be required to prove that the transfers . . . were fraudulent and improper in connection with its suit against [the]

1    subsequent transferee because the Trustee's Settlement with [the initial transferee] did not involve

2    any determination on the merits as to the initial transfers," and in this way, the subsequent

3    transferee "will be afforded its due process rights to contest the avoidability of these initial

4    transfers."); In re McMillin, 448 B.R. 847, 851 (M.D. Fla. 2011) ("[T]he court concludes that

5    [defendant] was not limited to raising only the defenses in 11 U.S.C. § 550 of a mediate

6    transferee.  Although this is the general rule, this rule is not strictly applied when the underlying

7    transfer was avoided by virtue of a default judgment."), rev'd in part on other grounds, appeal

8    dismissed in part, 482 F.App'x 454 (11th Cir. 2012); In re AVI, Inc., 389 B.R. 721, 735 (B.A.P. 9th

9    Cir. 2008) (holding that a trustee is not required to avoid the initial transfer from the initial

10   transferee before seeking to avoid it and recover from subsequent transferees, and noting that this

11   "conclusion is consistent with case law that has disallowed automatic recovery from a subsequent

12   transferee following the avoidance of an initial transfer through a stipulated judgment or default

13   when the transferee had not been a party to the underlying avoidance proceeding").

14          In short, where the Trustee settled with Andra for less than one percent of the amount of

15   the transfer in exchange for a stipulated judgment that the transfer was avoided, and seeks to

16   impose liability on appellees for the entirety of the transfer with the avoidability issue pre-

17   determined, it is clear that prohibiting defendants from raising and challenging the avoidability

18   issue would constitute a violation of their due process rights.

19          None of the cases relied on by the Trustee have convinced the court that the bankruptcy

20   court erred in any way.  For example, in support of her contention that "neither the Trustee nor her

21   counsel had any duty to inform or otherwise advise [appellees] about the effects that the

22   [Settlement Agreement and stipulated judgment] could have in the next phase of the litigation[,]"

23   (Dye Reply at 16), the Trustee cites cases imposing a duty on attorneys to undertake reasonable

24   research and analysis to understand the relevant legal principles, see, e.g., Wright v. Williams, 47

25   Cal.App.3d 802, 809 (1975) (an attorney's duty to his clients "encompasses both a knowledge of

26   law and an obligation of diligent research and informed judgment"), and cases supporting the

27   proposition that "reliance is not justified when the parties are in an adverse relationship."  (Dye

28   Reply at 16); see, e.g., Tambourine Comerico Int'l S.A. v. Solowsky, 2007 WL 689466, at *7 (S.D.

Fla. 2007) (collecting cases).  However, those cases are simply inapplicable as they beg the question as to whether appellees could be bound by a settlement agreement and stipulated judgment they did not sign.[6]

What's more, contrary to the Trustee's assertion, (see Dye Reply at 18-19), appellees did not waive their due process rights.[7]  The Trustee misconstrues appellees' argument.  They do not challenge the constitutionality of § 547 or § 550.  Rather, they disagree with the Trustee that "applying the statutory scheme for avoidance as written" necessarily leads to their preclusion from arguing avoidance on its merits.  This is a matter of statutory interpretation, not a constitutional challenge and, as the bankruptcy court noted, appellees' "interpretation is not contrary to the

---

[6] Even assuming the cited cases were applicable, it is clear that had appellees' attorneys researched the question of whether a stipulated judgment arising from a settlement with a co-defendant could deprive them of the right to litigate the avoidance issue on its merits, they would likely have concluded, based on the cases available at the time, such as Food & Fibre and Jones Storage, that their clients were not bound by the stipulated judgment.  Further, given that it was not at all clear from the face of the stipulated judgment that its entry would resolve the avoidance issue as to every defendant, the Trustee had an obligation to apprise appellees – which she did not do – that the stipulated judgment was enforceable against them, even though they had not signed it or the underlying Settlement Agreement.  See Fuentes, 407 U.S. at 80, 92 S.Ct. at 1994 ("Parties whose rights are to be affected are entitled to be heard[.]").

[7] The Trustee's reliance on In re Valley Health System, 2012 WL 3205173 (B.A.P. 9th Cir. 2012), is unpersuasive.  There, the plaintiff filed a proof of claim based on an entitlement to benefits under the debtor's retirement plan, but the debtor's Chapter 9 Plan specified that participants in the retirement plan would have no recourse against the debtor or its assets and would not be entitled to any distribution under the Chapter 9 Plan.  See id. at *4.  The plaintiff had actual notice of the Chapter 9 Plan and its contents and the opportunity to object, but did not do so before the plan was confirmed.  See id.  She argued that because the debtor's representatives stated that the retirement plan's participants would not be affected by the Chapter 9 Plan, she was not given adequate notice of the Plan's impact on her, amounting to a violation of her due process rights.  See id.  The court disagreed, stating that "due process does not require that any notice given explain the potential legal and practical effects of proposed judicial action; rather, as long as a party is given notice of the action and is afforded an opportunity to object, due process requirements are satisfied."  Id. (citation omitted).

In Valley Health, the Plan itself "was not misleading regarding how the claims of Participants would be treated: it unequivocally stated that they would receive nothing from [the debtor], its assets, or its Chapter 9 Plan." 2012 WL 3205173, at *4.  Here, on the other hand, the stipulated judgment did not state that the transfer was avoided once and for all against all challengers, and certainly did not do so "unequivocally." (See ER1 at 07272).  Since appellees were not parties to the stipulated judgment or the Settlement Agreement, they retained the right to contest avoidability on the merits.

15

1  relevant legislative history, the overall statutory scheme, and Ninth Circuit precedent." Flashcom,

2  361 B.R. at 525.

3      In her Reply,[8] the Trustee, among other cases that could have been raised earlier, relies

4  on Regions Bank v. J.R. Oil Co., LLC, 387 F.3d 721 (8th Cir. 2004), to support her contention that

5  res judicata principles apply to the stipulated judgment and, in any event, the court "need not rely

6  on it entirely because the application of res judicata principles to in rem judgments has no 'same

7  parties or privies' element." (Dye Reply at 10; see id. at 11-12). As an initial matter, the Trustee

8  appears to mislead the court by leaving out the sentence that completely undermines its argument.

9  For example, the Trustee asserts that avoidance of a preference is an in rem proceeding, (see

10  Dye Reply at 11-12), and that "[a] judgment in rem has been held to be an exception to the rule

11  that a decision is available as res judicata only to parties and their privies[.]" (See Dye Reply at

12  10) (quoting 50 Corpus Juris Secundum, Judgments § 1387). However, the Trustee neglects to

13  include that the very next sentence from the quoted section: "However, a judgment in a

14  proceeding in rem has also been held not to be res judicata as to persons not parties to the

15  proceedings or in privity with a party." 50 Corpus Juris Secundum, Judgments § 1387 (emphasis

16  added).

17      In any event, the facts of Regions Bank make it clear that the case is inapposite. In

18  Regions Bank, a lender brought a RICO action against debtors and their family members and

19  friends in a case that culminated in a bankruptcy sale of the collateral used for the debtors' loan.

20  387 F.3d at 723. In holding that the RICO case was an impermissible collateral attack on the final

21  judgment of the bankruptcy court, the court noted that since it was an in rem proceeding, "[n]ormal

22

23  _____

24    [8] The court will not address most of the cases raised by the Trustee in its Reply papers. First, the court has reviewed all the cases and virtually all of them are inapplicable or otherwise

25  unpersuasive. Also, the court is troubled by what appears to be "sandbagging" on the part of the Trustee. For example, the Trustee's argument in her Opening Brief relating to res judicata of the

26  stipulated judgment is limited to two paragraphs. (See Dye Opening Brief at 16-17). In its Reply brief, the Trustee's argument relating to the res judicata argument is six and a half pages, adds

27  a new facet to its argument (i.e., the in rem nature of the avoidability of a transfer has no privity requirement) and puts forth several cases that were available to it earlier and which appellees did

28  not have an opportunity to address. (See Dye Reply at 6-12).

1   principles of res judicata . . . are not necessary for the judgment in the . . . bankruptcy to bar [the

2   lender's] claims to the extent those claims relate to the sale of the collateral." Id. at 731.  This was

3   because "the bankruptcy court . . . approved the sale and found the sale to be in good faith, for

4   fair value, and in the best interest of [the debtor] and its creditors," and a bankruptcy sale "is a

5   judgment that is good as against the world, not merely as against parties to the proceedings." Id.

6   at 732.

7        The lender in Regions Bank was seeking to mount a collateral attack on the bankruptcy

8   court's considered judgment.  Here, in contrast, while one defendant settled with the Trustee, the

9   other defendants, i.e., appellees, did not choose to settle.   The bankruptcy court entered a

10  stipulated judgment on behalf of the settling parties, but never made its own determination that

11  the transfer was avoidable under § 547(b).  In contrast, in Regions Bank, the bankruptcy court

12  made a factual and legal determination that the sale was in good faith, for fair value, and in the

13  best interests of the debtor and its creditors.[9]  Regions Bank, 387 F.3d at 732.

14  II.   FRAUDULENT TRANSFER

15        Prior to the trial on the Trustee's § 547(b) preferential transfer claim, the bankruptcy court

16  on summary judgment decided in favor of appellees on the Trustee's § 548(a)(1)(B) constructive

17  fraudulent transfer claim.  (See Court's Memorandum Decision of July 28, 2004, at 16-21).  In

18  order for a trustee to avoid a transfer under § 548(a)(1)(B), the debtor must have received less

19  than a reasonably equivalent value in exchange.  11 U.S.C. § 548(a)(1)(B)(i).  The bankruptcy

20  court found that Flashcom received reasonably equivalent value for the $9,000,000 transfer

21  _____

22  [9] Indeed, in Jones Storage, which specifically dealt with a stipulated avoidance judgment, the
    court held that the application of res judicata would be inappropriate.  See Jones Storage, 2005

23  WL 2590385, at *4 ("The Court has no hesitation in holding that res judicata does not apply in this
    case. . . . To hold that res judicata applies in this circumstance would deprive the Bank of its right

24  to defend the claim against it and would open the door to substantial abuse. . . .  The Court
    sustains the Bank's position that the Trustee may not rely upon the stipulated avoidance judgment

25  . . . to satisfy his burden under section 550 to establish that the transfer by the Debtor of the
    $27,009.86 has been avoided under section 547.").  Moreover, in rem proceedings must still

26  comport with the requirements of due process.  See In re Snow, 201 B.R. 968, 971 (Bankr. C.D.
    Cal. 1996) (finding that it was appropriate to grant in rem relief relating to property owned by the

27  debtor, but that "due process considerations . . . prohibit[ed] the issuance of an order binding the
    [property's] co-owners").  As previously discussed, those requirements have not been met here.

28

17

1  because, under <u>In re Northern Merchandise, Inc.</u>, 371 F.3d 1056 (9th Cir. 2004), there was no

2  negative "net effect" on Flashcom's estate.  (<u>See</u> Court's Memorandum Decision of July 28, 2004,

3  at 21).  The Trustee contends that this holding was error resulting from the misapplication of

4  <u>Northern Merchandise</u>.  (<u>See</u> Dye Opening Brief at 21-24).

5      "It is well settled that reasonably equivalent value can come from one other than the

6  recipient of the payments, a rule which has become known as the indirect benefit rule."  <u>N. Merch.</u>,

7  371 F.3d at 1058 (internal quotations and citation omitted).  " 'If the consideration given to the third

8  person otherwise has ultimately landed in the debtor's hands, or if the giving of the consideration

9  to the third person otherwise confers an economic benefit upon the debtor, then the debtor's net

10  worth has been preserved, and [the statute] has been satisfied – provided, of course, that the

11  value of the benefit received by the debtor approximates the value of the property or obligation he

12  has given up.' "  <u>Id.</u> at 1058-59 (alteration in original) (quoting <u>Rubin v. Mfrs. Hanover Trust Co.</u>,

13  661 F.2d 979, 991-92 (2d Cir. 1981)).  If the debtor receives such reasonably equivalent value,

14  "then the transaction has not significantly affected his estate and his creditors have no cause to

15  complain."  <u>Rubin</u>, 661 F.2d at 991.

16      In <u>Northern Merchandise</u>, the defendant provided a loan to a newly formed company,

17  eventually the debtor.  <u>See</u> 371 F.3d at 1057.  Later that year, the company sought a second loan

18  from the defendant to provide it with working capital.  <u>See id.</u>  The defendant determined that the

19  company's financial performance did not warrant an additional direct loan, but agreed to loan the

20  money to the company's shareholders with the understanding that they would allow the company

21  to use the money to fund its business operations.  <u>See id.</u>  The transaction was documented as

22  a loan to the shareholders, who then turned the funds over to the company, but in fact the

23  defendant deposited the loan money directly into the company's account.  <u>See id.</u> at 1057-58.

24  The company gave the defendant a security interest in its inventory.  <u>See id.</u> at 1058.  When the

25  company ceased doing business, the defendant received the proceeds from the sale of the

26  company's inventory to satisfy the loan to the shareholders.  <u>See id.</u>

27      The company's bankruptcy trustee argued that the grant of the security interest and the

28  transfer of the inventory sale proceeds to the defendant constituted fraudulent transfers under §

1  548.  See N. Merch., 371 F.3d at 1058.  The Ninth Circuit "reject[ed] this formalistic view" because

2  "[a]lthough [the company] was not a party to the October loan, it clearly received a benefit from

3  that loan" when the defendant deposited the loan money into the company's account.  Id. at 1059.

4  According to the court, "the primary focus of Section 548 is on the net effect of the transaction on

5  the debtor's estate and the funds available to the unsecured creditors."  Id.

6         Here, the Trustee focuses on Flashcom's redemption of Andra's stock in exchange for the

7  $9,000,000 payment in isolation, arguing that a corporation receives nothing of value when it

8  redeems a shareholder's stock.  (See Dye Opening Brief at 25-27).  However, when reviewing the

9  net effect of a transaction, it is appropriate to consider the entire context in which the transaction

10  took place, including other related transactions.  See In re All American Bottled Water Corp., 2009

11  WL 722994, *4-5 (W.D. Wash. 2009), aff'd, 404 Fed.Appx. 111 (9th Cir. 2010) (noting that "[t]he

12  focus is whether the net effect of the transaction has depleted the bankruptcy estate" and that "it

13  is proper under appropriate circumstances to evaluate a series of transactions as a whole in

14  determining whether reasonably equivalent value was received"); In re National Forge Co., 344

15  B.R. 340, 351 (W.D. Penn. 2006) ("[W]e reject the Committee's suggestion that the NFC-to-

16  Holdings transfer can rationally be viewed in isolation, as a transaction separate and distinct from

17  the Holdings-to-shareholder distributions.  [W]here a transfer is only a step in a general plan, the

18  plan must be viewed as a whole with all its composite implications.").

19         In re Phar-Mor, Inc. Securities Litigation, 185 B.R. 497 (W.D. Penn. 1995), aff'd, 101 F.3d

20  689 (3d Cir. 1996), the court considered whether multiple transactions may be "collapsed" into one

21  transaction in order to consider whether the debtor received reasonably equivalent value.[10]  The

22  debtor, prior to bankruptcy, decided to attempt to raise $125 million in new capital to finance an

23

24     10   According to the Trustee, "defendants, especially defendants who designed the several
   transactions in question, should almost never be allowed to advocate for collapsing" because "the
25  doctrine is a plaintiff's tool."  (See Dye Reply at 22).  However, courts have not limited the doctrine
   in this manner.  See, e.g., All American, 2009 WL 722994 at *4 ("The Trustee is correct that
26  typically it is the plaintiff or trustee seeking to collapse multilateral transactions into a single
   transaction for the purpose of demonstrating that the insolvent debtor did not receive reasonably
27  equivalent value for the transfer at issue.  This does not mean, however, that the doctrine is not
   applicable to the converse situation.").
28

1  expansion.  See id. at 499.  One investor agreed to purchase the entire $125 million of equity that

2  the debtor was planning to sell, but also wanted to purchase an additional $75 million worth of

3  shares from two shareholders who had expressed an interest in selling part of their equity.  See

4  id.  The structure of the deal was eventually modified so that the investor would pay $200 million

5  directly to the debtor, which would then use $75 million of the proceeds to repurchase shares from

6  existing shareholders by way of a tender offer.  See id.  The new structure allowed all

7  shareholders the opportunity to participate in the liquidity opportunity and avoided potential liability

8  that could arise from a direct purchase under the securities laws due to the investor's superior

9  knowledge of the debtor's financial condition gained during due diligence efforts.  See id.

10        The court found that because "the two exchanges at issue were part of an integrated

11  transaction undertaken by [the debtor] for the purpose of raising $125 million in capital," it would

12  "not examine the tender offer in isolation, rather, [it would] analyze the net effect of the integrated

13  transaction upon the debtor."  Phar-Mor, 185 B.R. at 503.  The same type of analysis is

14  appropriate here.[11]  Just as in Phar-Mor, where "the effect of the integrated transaction . . . was

15  a net financial gain for [the debtor] of $125 million in new equity," id. at 504, the effect here was

16  a net financial gain for Flashcom of $75 million in new equity.  There, the investor may not have

17  agreed to invest the $125 million without the opportunity to purchase the additional $75 million in

18  equity.  See id. (the $75 million tender offer was a "material inducement" in the investor's decision

19  to invest in the company).  Here, the investors would not have completed the Series B Financing

20  without Andra's release of claims against Flashcom.[12]  (See Court's Order of September 23, 2011,

21  _____

22  [11]  The Trustee attempts to distinguish Phar-Mor by noting that in that case, "there was no
    prior independent obligation on the part of the defendants to redeem the insider's stock."  (See
23  Dye Reply at 24 n. 8).  However, this argument neglects the important fact that the VC Funds'
    obligation to pay $9,000,000 for Andra's stock was only triggered in the event that the financing
24  occurred and provided at least $30 million to Flashcom.

25  [12]  The Trustee cites Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd.
    P'ship IV, 229 F.3d 245 (3d Cir. 2000), to argue that a release of claims adds nothing where the
26  claims have not yet been asserted and were not valued.  (See Dye Opening Brief at 26).
    However, in that case, the defendant "failed to establish the reality of such claims," and the court
27  found that they "may fairly be considered non-existent."  Id. at 252.  Here, in contrast, the
    bankruptcy court found that the transfer "was a critical condition of the equity funding because

28

at 13).   In turn, Andra would only release Flashcom from her claims when she was paid $9,000,000 for her stock.  (See ER1 at 22682; AF at ¶¶ 34 & 37).

In sum, Flashcom received the benefit of a net gain of $75 million of new financing (after the $9,000,000 transfer) and a release of all of Andra's claims against Flashcom.  (See AF at ¶ 34; Court's Order of September 23, 2011, at 15; ER1 at 22682).   While Flashcom may have transferred $9,000,000 from its account to Andra's account, it was never really Flashcom's money; it was the investors' money.[13]  Initially, and as set forth in the Loan and Pledge Agreement, the VC Funds "and/or other investors" in Flashcom's planned Series B Financing would purchase Andra's stock for $9,000,000, but only in the event that Flashcom obtained at least $30 million in Series B Financing money.  (See ER1 at 22572).   The plan was to offer Andra's common stock and the Series B Preferred Stock as a "unit purchase" and have each investor buy both.  (See AF at ¶ 27). Flashcom's investment banker, TWP, thought that this structure was too complicated, and recommended a simpler approach in which investors would purchase Series B Preferred Stock only, and Flashcom would pay Andra with the proceeds.  (See id.).   As such, the amount of stock Flashcom planned to offer was increased to $40 million in shares, with the express understanding by all investors that $9 million of the amount raised would be paid to Andra.  (See id. at ¶¶ 22 & 28).   Either way, investors would pay $9,000,000 to purchase Andra's shares, and thus the net effect is the same.

The method of payment of the $9,000,000 from the investors to Andra made no difference to Flashcom or its assets.   Flashcom issued $9,000,000 more in Series B shares than it had originally planned, but it received $9,000,000 of Andra's common stock shares, so again, the net effect is the same.   Under the original "unit purchase" plan, the investors would have held Andra's

---

Series B investors did not want the distractions and uncertainties associated with Andra's claims and threatened litigation."  (See Court's Order of September 23, 2011, at 14).

[13]  The Trustee argues that "[w]hile the Series B investors may have needed Andra's release, Flashcom did not have to pay $9,000,000 for them to get it" because the VC Funds should have paid that amount.  (Dye Opening Brief at 27).   However, as discussed above, when the entire context is considered, it was really the investors who paid Andra $9,000,000, not Flashcom.

1    common stock, so it is not as though Flashcom would have otherwise been entitled to Andra's

2    stock in exchange for nothing.

3         Finally, the Trustee's reliance on Wells Fargo Bank v. Desert View Bldg. Supplies, Inc., 475

4    F.Supp. 693 (D. Nev. 1978), aff'd, 633 F.2d 225 (9th Cir. 1980), to support her argument that the

5    transfer lacked reasonably equivalent value, (see Dye Opening Brief at 23-24), is unpersuasive.

6    In Wells Fargo Bank, a parent company pledged all of its stock in its wholly-owned subsidiary to

7    a bank as collateral for a loan from the bank to the parent company.  See 475 F.Supp. at 695.

8    The parent company subsequently defaulted and, as part of a refinancing agreement, the

9    subsidiary's stock was returned to the parent company in exchange for an agreement by the

10   subsidiary to take out a secured loan of $250,000.  See id.  The proceeds of that loan went, first,

11   to the parent company in the form of a dividend and, then, to the bank as partial payment of the

12   parent company's debt, and the court found that there was no fair consideration.  See id. at 695

13   & 697.

14        The Trustee believes that Wells Fargo is similar to this case because both involve a debtor

15   taking up another's pre-existing obligation.  (See Dye Opening Brief at 23).  However, the net

16   effect of the transaction in Wells Fargo was for the subsidiary to be "pushed toward bankruptcy"

17   because its "total liabilities were nearly doubled," while the parent company's "debt was reduced

18   substantially."  475 F.Supp. at 695 & 697.  Here, in contrast, the net effect of the transaction was

19   a gain of $75 million in Series B Financing for Flashcom.  Under Northern Merchandise, the "net

20   effect of the transaction on the debtor's estate" is what matters.  371 F.3d at 1059.  In short, the

21   court agrees with the bankruptcy court's conclusion that Flashcom received reasonably equivalent

22   value for the transfer.

23

24

25

26

27

28

1    III.    PREFERENTIAL TRANSFER TRIAL

2          Because the court has found that the stipulated judgment did not render the trial

3    unnecessary, it must consider the Trustee's argument that the bankruptcy court erred at trial.

4    (See Dye Opening Brief at 31-38).

5          A.    Insolvency

6          At trial, the Trustee sought to avoid the $9,000,000 transfer as a preferential transfer under

7    11 U.S.C. § 547(b).  (See Court's Order of September 23, 2011, at 22).  "To succeed in a

8    preference action, a trustee must show, inter alia, that the debtor was insolvent at the time of the

9    contested transaction."  In re DAK Indus., Inc., 170 F.3d 1197, 1199 (9th Cir. 1999) (italics in

10   original).    Given that the transfer occurred more than 90 days before Flashcom filed for

11   bankruptcy, (see AF at ¶ 40) (transfer occurred on February 23, 2000); (see Court's Order of

12   September 23, 2011, at 22) (Flashcom filed for bankruptcy on December 8, 2000), there is no

13   presumption of insolvency, and the Trustee had the burden of proving insolvency at trial.  See 11

14   U.S.C. § 547(f) ("[T]he debtor is presumed to have been insolvent on and during the 90 days

15   immediately preceding the date of the filing of the petition."); § 547(g) ("The trustee has the burden

16   of proving the avoidability of a transfer under subsection (b) of this section[.]"); In re EECO Inc.,

17   138 B.R. 260, 262-63 (Bankr. C.D. Cal. 1992) ("As the alleged transfers occurred more than 90

18   days prior to the filing of [the debtor's] petition, there is no presumption of insolvency.").  A finding

19   of insolvency is reviewed for clear error.  See In re Kaypro, 218 F.3d 1070, 1073 (9th Cir. 2000)

20   ("Findings of fact, such as the finding of insolvency, are reviewed for clear error.").

21          "The Bankruptcy Code defines insolvency, for a corporation, as a 'financial condition such

22   that the sum of such entity's debts is greater than all of such entity's property, at fair valuation[.]'"

23   DAK Indus., 170 F.3d at 1199 (quoting 11 U.S.C. § 101(32)).  "Although the Code does not define

24   'fair valuation,' courts have generally engaged in a two-step process of analysis."  Id. (citation

25   omitted).  "First, the court must determine whether a debtor was a 'going concern' or was 'on its

26   deathbed.'  Second, the court must value the debtor's assets, depending on the status determined

27   in the first part of the inquiry, and apply a simple balance sheet test to determine whether the

28   debtor was solvent."  Id. (citation omitted).  "If the debtor was a going concern [at the time of the

23

1  transfer], the court will determine the fair market price of the debtor's assets as if they had been

2  sold as a unit, in a prudent manner, and within a reasonable time.  If the company was on its

3  deathbed, i.e., only nominally extant, then the court will determine the liquidation value of the

4  assets, such as a price expected at a foreclosure sale."  Id. at 1199 n. 3.

5      "[A] business does not have to be thriving in order to receive a going concern valuation.

6  Before the going concern valuation is to be abandoned, a business must be wholly inoperative,

7  defunct, or dead on its feet."  In re Am. Classic Voyages Co., 367 B.R. 500, 508 (Bankr. D. Del.

8  2007), aff'd, 384 B.R. 62 (D. Del. 2008) (internal quotation marks and citations omitted).  Here,

9  appellees's expert, Sugarman, valued Flashcom at approximately $400 million on a going-concern

10  basis just prior to the transfer.  (See Court's Order of September 23, 2011, at 21; ER1 at 25390).

11  In contrast, the Trustee's expert, David Hahn ("Hahn"), declined to provide a valuation of the entire

12  entity of Flashcom on a going-concern basis.  (See ER1 at 21359-60) (Hahn Testimony: "I haven't

13  valued Flashcom as an entire entity on a going-concern basis.").  The uncontroverted testimony

14  of Sugarman is enough for the court to conclude that the Trustee did not meet her burden to show

15  that Flashcom was insolvent.  See DAK Indus., 170 F.3d at 1199 ("To succeed in a preference

16  action, a trustee must show, inter alia, that the debtor was insolvent at the time of the contested

17  transaction.") (italics in original, emphasis added).

18      In any event, the bankruptcy court correctly concluded that Flashcom should be valued on

19  a going-concern basis.  (See Court's Order of September 23, 2011, at 22-29).  The court

20  dedicated several pages of its decision to explaining why Flashcom should be valued as a going

21  concern, including that it was able to raise millions of dollars in its oversubscribed Series B

22  Financing, that Flashcom's vendors were willing to extend it substantial credit, that the investment

23  community was uniformly optimistic about Flashcom's prospects, and that it was receiving 1,500

24  new orders for subscriber lines each week, among other things.  (See id.).

25      Even though "[t]he going concern threshold is very low," In re Heilig-Meyers Co., 319 B.R.

26  447, 457 (Bankr. E.D. Va. 2004), aff'd, 328 B.R. 471 (E.D. Va. 2005), the Trustee contends that

27  the bankruptcy court incorrectly (1) included cash received after the transfer date as an asset; (2)

28  did not count debts that Flashcom owed at the transfer date as liabilities; and (3) valued

Flashcom's body of DSL subscribers in place, not as if sold.  (See Dye Opening Brief at 31).

According to the Trustee, absent these alleged errors, the bankruptcy court would have had no

choice but to conclude that Flashcom was insolvent on the transfer date. (See id.).  The Trustee's

contentions are unpersuasive.

    First, the Trustee's assertion that under generally accepted accounting principles ("GAAP"),

the $5,700,000 of Series B funds should have been excluded because the funds had not yet

closed,  (see Dye Opening Brief at 37), is unpersuasive.  For preference purposes, GAAP is not

controlling in determining the fair market value of assets or the insolvency of the debtor, and the

court must make its own determination of the fair market value of assets for purposes after

considering all the evidence presented.  See In re Sierra Steel, Inc., 96 B.R. 275, 278 (B.A.P. 9th

Cir. 1989) ("Requiring application of GAAP would make accountants and the board which

promulgate GAAP the arbiters of insolvency questions.  Clearly the Code provides that judges

should make such decisions.  Furthermore, there is no policy reason why judges should not be

allowed to consider subsequent events . . . in valuing assets and determining liabilities.  Thus

although GAAP are relevant, they are not controlling in insolvency determinations."); Kaypro, 218

F.3d at 1076 ("There is no generally accepted accounting principle for analyzing the insolvency

of a company.").

    Here, the bankruptcy court correctly concluded that the $5,700,000 in Series B proceeds

should be included because the "investors were contractually committed to fund their obligation

to purchase Series B shares, and Flashcom would have had a claim against these investors if the

payment was not made." (See Court's Order of September 23, 2011, at 30).  Indeed, the Series

B Stock Purchase Agreement provided that when it was "executed and delivered, [it would]

constitute a valid and legally binding obligation of [each] Investor . . . in accordance with its

terms[.]"[14]  (See ER1 at 22828).  In any event, the Series B proceeds arrived two days later.  (See

_____

    [14]  The Trustee argues that these funds were not legally committed because the offering would
not close until all new investments were in, (see Dye Opening Brief at 37, citing ER1 at pages
22819 and 22833), but the pages of the record (i.e., the Stock Purchase Agreement) it cites does
not say anything that negates the language on page 22828 to the effect that the agreement was
binding when executed and delivered.

Court's Order of September 23, 2011, at 30).  Moreover, Hahn testified that as of the transfer date, it was more likely that 100% of the legally committed Series B proceeds would be received than the projected 90% of Flashcom's accounts receivable, which he did include as assets in his solvency analysis.  (See id.).

Second, the Trustee's contention that the bankruptcy court erred by not counting $6,700,000 in bridge loans that Flashcom owed to the VC Funds and Intel Corporation as a liability, (see Dye Opening Brief at 36-37), is unpersuasive.  The Trustee contends that these loans were not counted because they were not absolute, but liabilities include debts that are contingent or disputed.  (See id. at 37) (citing 11 U.S.C. §§ 101(5)(A) & 101(12)).  However, "[a] contingent liability must be reduced . . . to its present or expected amount before a determination on insolvency can be made.  To determine a contingent liability, one must discount it by the probability that the contingency will occur and the liability will become real."  Sierra Steel, 96 B.R. at 279 (citation omitted).  This is exactly what the bankruptcy court did.  The court found that the promissory notes relating to the bridge loans provided that the notes would automatically be converted to equity upon Flashcom's receipt of at least $30 million in Series B proceeds, and that Hahn had failed to take account of this eventuality in his computations.  (See Court's Order of September 23, 2011, at 31).  As such, the court concluded that "the probability that these notes would have to be paid from the company's assets was extremely low."  (See id. at 32).  Under the circumstances, the bankruptcy court was correct not to include the bridge loans as a liability in its insolvency determination.

Third, the Trustee's assertion that the bankruptcy court erroneously adopted appellees' experts' valuation which used book value in determining the value of Flashcom's DSL subscribers, (see Dye Opening Brief at 34), is unpersuasive.  According to Sugarman, the value of Flashcom's subscriber contracts as of the transfer date was $21,880,615.  (See ER1 at 14889).  Sugarman explained that "had Flashcom put up its subscriber contracts for sale in February of 2000, those contracts would have been viewed as very valuable in the marketplace," and he believed that "there would have been a bidding war to purchase Flashcom's contracts," (see id. at 14888-89), so it appears that the subscriber contracts were valued as if sold.  Regardless, while "[b]ook value

1   does not necessarily prove fair market value, [it] is competent evidence." Mizell v. Phillips, 240

2   F.2d 738, 741 n. 2 (5th Cir. 1957); 2 Collier on Bankruptcy, § 101.32[4] (Matthew Bender & Co.,

3   Inc. 2013) ("[B]ook values are not tantamount to fair value, but may furnish an adequate measure

4   thereof under the particular conditions of a case.").

5           Finally, the Trustee contends that based on her expert's testimony, the amount they would

6   bring in an orderly sale was approximately $3,345,000, much lower than Sugarman's estimate.

7   (See Dye Opening Brief at 34).  However, Hahn relied on the valuation opinion of Mark Spragg

8   ("Spragg"), the Trustee's subscriber contracts valuation expert.  (See Court's Order of September

9   23, 2011, at 33).  Spragg admitted that he did not consider all of the testimony of key members

10  of Flashcom's management and Board, and multiple witnesses testified at trial that the data

11  Spragg relied upon was unreliable compared to the data relied upon by appellees' subscriber

12  contracts valuation expert, Gary Hagmueller ("Hagmueller").  (See id. at 33-34).  Given these

13  deficiencies, the bankruptcy court did not err in giving Spragg's analysis little weight.  (See id. at

14  33).  In short, the bankruptcy court's determination that Flashcom was solvent on the date of the

15  transfer was not clearly erroneous.

16          B.      Admissibility of Appellees' Expert Testimony

17          The Trustee contends that Hagmueller and Sugarman's testimony and expert reports

18  should have been excluded under Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S.Ct.

19  2786 (1993).  (See Dye Opening Brief at 35).  According to the Trustee, "Hagmueller's testimony

20  was inadmissible because the experience foundation for his expertise came from a readily

21  distinguishable industry."  (Id. at 35).  With respect to Sugarman, the Trustee contends that the

22  bankruptcy court erred in relying on Sugarman's testimony because Sugarman used book value

23  in his calculations.  (See id. at 35-36).  The Trustee's contentions are unpersuasive.

24          The district court reviews the bankruptcy court's decision regarding whether to admit expert

25  testimony for abuse of discretion.  In re Pletz, 234 B.R. 800, 801 (D. Or. 1998), aff'd, 221 F.3d

26  1114 (9th Cir. 2000) ("Review for the admission of expert testimony is for abuse of discretion.");

27  see Summers v. Delta Air Lines, Inc., 508 F.3d 923, 926 (9th Cir. 2007) ("We review for abuse of

28  discretion the . . . decision to admit expert testimony.").  Federal Rule of Evidence 702 provides

1    that a witness may be qualified as an expert by "knowledge, skill, experience, training, or

2    education." Rule 702 "contemplates a broad conception of expert qualifications." Thomas v.

3    Newton Int'l Enters., 42 F.3d 1266, 1269 (9th Cir. 1994); United States v. Hankey, 203 F.3d 1160,

4    1168 (9th Cir.), cert. denied, 530 U.S. 1268 (2000) ("[I]n considering the admissibility of testimony

5    based on some 'other specialized knowledge' [as opposed to scientific knowledge], Rule 702

6    generally is construed liberally.").

7           With respect to Hagmueller, the Trustee provides no authority to support her contention that

8    Hagmueller's experience as a wholesaler of DSL services during the relevant period was

9    insufficient for him to value Flashcom's business as a reseller of DSL services. (See, generally,

10   Dye Opening Brief at 35). Since "[d]oubts about the usefulness of expert testimony should be

11   resolved in favor of admissibility," Whitaker v. Maldonado, 2009 WL 1936803, *3 (D. Ariz. 2009),

12   and the bankruptcy court found that Hagmueller had specialized knowledge as an industry

13   practitioner in valuing DSL subscriber contracts, (see ER1 at 19867), it was not an abuse of

14   discretion for the bankruptcy court to admit and consider Hagmueller's testimony and expert

15   report. Finally, with respect to Sugarman, the Trustee simply advances the same argument – that

16   the bankruptcy court did not appropriately value Flashcom's assets – which the court has already

17   rejected. See supra at § III.A.

18          C.    Contemporaneous Exchange of Value

19          Under 11 U.S.C. § 547(c)(1), a trustee may not avoid a transfer to the extent that it was "(A)

20   intended by the debtor and the creditor to or for whose benefit such transfer was made to be a

21   contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially

22   contemporaneous exchange." "For a contemporaneous exchange defense, the parties' intent, the

23   existence of new value, and contemporaneousness are all questions of fact. Therefore, the

24   standard of review is whether the bankruptcy judge's findings were clearly erroneous." Kendall

25   v. Liquid Sugars, Inc., 227 B.R. 530, 533 (N.D. Cal. 1998).

26          The Trustee claims that the bankruptcy court "could not and did not quantify and specify

27   what Flashcom received, of approximately equal value to its $9,000,000 cash." (Dye Opening

28   Brief at 37). To the contrary, the bankruptcy court specifically addressed this issue in its decision:

> Here, Flashcom was the beneficiary of net capital of $75 million from the
> recast transaction, and Flashcom received the equivalent, if not more, than
> the original transaction. . . . Thus, the "new value" provided to Flashcom
> from the Transfer is indisputably quantifiable; the delivery of the Settlement
> Agreement and the Sachs [Stock Purchase Agreement] was worth $84
> million of simplified equity financing, which the company would not have been
> able to receive without the $9M Transfer.

(See Court's Order of September 23, 2011, at 36).

Additionally, the Trustee raise the same arguments – that Flashcom "did not receive anything from Andra except her common stock and a meaningless release," (Dye Opening Brief at 38), that the new investors' money was not an exchange because Flashcom would still have received the Series B money, (see id.; Dye Reply at 26-27), and that use of the collapsing theory was inappropriate, (see Dye Reply at 24) – which the court has already rejected.[15]  See supra at Section § II.[16]

IV.    STOCK REDEMPTION UNDER DELAWARE LAW

Under Delaware law, corporations may purchase or redeem their own shares, except when the capital of the corporation is impaired or when the purchase or redemption of shares would cause the capital of the corporation to be impaired.  See 8 Del. C. § 160(a).  "Capital is impaired 'if the funds used in the repurchase exceed the amount of the corporation's "surplus," defined by

---

[15]    The Trustee also argues that the transfer was conclusively avoided by the stipulated judgment and that this somehow resolves the § 547(c)(1) defense in her favor.  (See Dye Reply at 25-26).  However, as discussed above, see supra at § I., appellees have a due process right to challenge the merits of the avoidance determination, which includes the right to present a § 547(c)(1) defense.

[16]    The Trustee finds further error in the bankruptcy court's determination that the VC Funds were not entities for whose benefit the $9,000,000 transfer was made under 11 U.S.C. § 550(a)(1). (See Dye Opening Brief at 20-21; Court's Order of September 23, 2011, at 37-38).  However, § 550 merely determines liability "to the extent that a transfer is avoided."  11 U.S.C. § 550(a). Since the court has decided that there was no error in the bankruptcy's court's determinations that the transfer is not avoidable as a preferential or fraudulent transfer under §§ 547 or 548, it is not necessary to address this argument.

1  8 Del. C. § 154 to mean the excess of net assets over the par value of the corporation's issued

2  stock.'" SV Inv. Partners, LLC v. ThoughtWorks, Inc., 37 A.3d 205, 210 (Del. 2011) (quoting Klang

3  v. Smith's Food & Drug Ctrs., Inc., 702 A.2d 150, 153 (Del. 1997)).  "Net assets are defined as the

4  amount by which total assets exceed total liabilities."  Id. (internal quotation marks and citation

5  omitted).

6          The Trustee first argues that the bankruptcy court erred in determining that appellees were

7  not liable under § 160(a) because  "a board must take affirmative steps to determine capital," and

8  Flashcom's board did not do so.[17]  (See Dye Opening Brief at 39).  However, as the Delaware

9  Supreme Court has stated, § 160 "requires only that there exist a surplus after a repurchase[.]

10  The statute carves out a class of transactions that directors have no authority to execute, but does

11  not, in fact, require *any* affirmative act on the part of the board." Klang, 702 A.2d at 156 (italics

12  in original).

13          Second, the Trustee argues that Flashcom was insolvent at the time of the transfer, and

14  "a corporation cannot be balance-sheet insolvent and meet the requirements of Section 160[.]"

15  (Dye Opening Brief at 39) (quoting SV Inv. Partners, LLC v. ThoughtWorks, Inc., 7 A.3d 973, 987

16  (Del. Ch. 2010), aff'd, 37 A.3d 205 (Del. 2011)).  However, as noted earlier, Flashcom was not

17  insolvent at the time of the transfer.  See supra at § III.A.

18  V.     SANCTIONS ORDER.

19          The Trustee and her counsel, Weinstein, maintain that the bankruptcy court erroneously

20  ordered sanctions against them under Federal Rule of Bankruptcy Procedure 9011.  (See,

21  generally, Weinstein Opening Brief).  A bankruptcy court's award of sanctions under Rule 9011

22  is reviewed for abuse of discretion.  See In re Deville, 361 F.3d 539, 547 (9th Cir. 2004)

23  (discussing review of a bankruptcy court's sanctions award, noting that "[t]his court reviews an

24  _____

25          [17]   The Trustee also contends that appellees were liable under 8 Del. C. § 174.  This section,
   however, is merely a liability provision holding directors jointly and severally liable for a violation
26  of § 160 or § 173 of the Delaware Code.  See 8 Del. C. § 174 ("In case of any wilful or negligent
   violation of § 160 or § 173 of this title, the directors under whose administration the same may
27  happen shall be jointly and severally liable . . . to the full amount of the dividend unlawfully paid,
   or to the full amount unlawfully paid for the purchase or redemption of the corporation's stock[.]").
28  With no predicate violation, there is no liability under § 174.

1  award of sanctions for an abuse of discretion"); <u>Cooter & Gell v. Hartmarx Corp.</u>, 496 U.S. 384,

2  405, 110 S.Ct. 2447, 2461 (1990) ("An appellate court should apply an abuse-of-discretion

3  standard in reviewing all aspects of a district court's Rule 11 determination."), <u>superseded by</u>

4  <u>statute, in part, on other grounds</u>.  "[P]recedents interpreting [Federal Rule of Civil Procedure] 11

5  may prove a helpful guide to our interpretation of Rule 9011." <u>Deville</u>, 361 F.3d at 552; <u>see</u> <u>In re</u>

6  <u>Grantham Bros.</u>, 922 F.2d 1438, 1441 (9th Cir.), <u>cert.</u> <u>denied</u>, 502 U.S. 826 (1991) (noting that

7  "the analysis of sanctions is essentially identical" under Rule 9011 and Rule 11).

8       Rule 9011 "empowers federal courts to impose sanctions upon the signers of paper where

9  a) the paper is 'frivolous', or b) the paper is filed for an 'improper purpose'." <u>Grantham Bros.</u>, 922

10  F.2d at 1441.  "In determining whether sanctions are warranted under Rule 9011(b), we must

11  consider both frivolousness *and* improper purpose on a sliding scale, where the more compelling

12  the showing as to one element, the less decisive need be the showing as to the other." <u>In re</u>

13  <u>Silberkraus</u>, 336 F.3d 864, 870 (9th Cir. 2003) (italics in original).  Additionally, "[w]hile either prong

14  is alone sufficient to warrant a sanction, this court must consider both because of the effect on the

15  nature and severity of the sanction." <u>Grantham Bros.</u>, 922 F.2d at 1441.

16       A.   <u>Frivolous</u>

17       "A frivolous paper is one that is both baseless and made without a reasonable and

18  competent inquiry.  That is, it is neither well-grounded in fact and warranted by existing law [nor]

19  a good faith argument for the extension, modification, or reversal of existing law." <u>In re Brooks-</u>

20  <u>Hamilton</u>, 400 B.R. 238, 252 (B.A.P. 9th Cir. 2009) (internal quotation marks and citations omitted)

21  (alteration in original).  The bankruptcy court concluded that the motion <u>in</u> <u>limine</u> the Trustee filed,

22  which argued that the stipulated judgment barred appellees from disputing avoidability, lacked a

23  reasonable basis in fact and law because it contravened the law of the case as set forth in Judge

24  Ryan's denial of the Trustee's summary judgment motion on the same issue.  (<u>See</u> Memorandum

25  Decision Re: VC Defendants' Motion for Sanctions Pursuant to Fed. R. Bankr. P. 9011, filed on

26  October 11, 2012 ("Court's Order of October 11, 2012") at 5).

27       "Under the 'law of the case' doctrine, a court [will not] reexamin[e] an issue previously

28  decided by the same or higher court in the same case." <u>United States v. Jingles</u>, 702 F.3d 494,

499 (9th Cir. 2012) (citation omitted), <u>cert</u>. <u>denied</u>, 133 S.Ct. 1650 (2013).  The doctrine is "a judicial invention designed to aid in the efficient operation of court affairs." <u>Milgard Tempering, Inc.</u> <u>v. Selas Corp. of Am.</u>, 902 F.2d 703, 715 (9th Cir. 1990) (citations omitted).  The law of the case doctrine "is founded upon the sound public policy that litigation must come to an end" and "serves to advance the principle that in order to maintain consistency during the course of a single lawsuit, reconsideration of legal questions previously decided should be avoided." <u>United States v. Smith</u>, 389 F.3d 944, 948 (9th Cir. 2004) (internal quotations and citations omitted), <u>cert</u>. <u>denied</u>, 544 U.S. 956 (2005).  "For the doctrine to apply, the issue in question must have been decided explicitly or by necessary implication in [the] previous disposition." <u>Jingles</u>, 702 F.3d 499 (internal quotations and citation omitted) (alteration in original).  "A decision on a factual or legal issue must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal in the appellate court, unless the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice." <u>Pit River Home and</u> <u>Agric. Coop. Ass'n v. United States</u>, 30 F.3d 1088, 1096-97 (9th Cir. 1994) (internal quotation marks and citations omitted).

After the entry of the stipulated judgment, the Trustee filed a motion for partial summary judgment arguing that by the terms of the stipulated judgment, avoidability of the transfer as a preferential transfer under 11 U.S.C. § 547(b) had been established and could not be challenged by appellees.  (<u>See</u> ER1 at 07287-305 & 07921-35).  The bankruptcy court analyzed this contention in depth, ultimately holding that appellees had a due process right to challenge the avoidability determination; the Trustee was required to prove the elements of avoidance under § 547(b) and could not rely solely on the stipulated judgment as having already established avoidability.  <u>See</u> <u>Flashcom</u>, 361 B.R. at 522-26.  The Trustee proceeded to ask for reconsideration, (<u>see</u> ER1 at 09157-71), which was denied, (<u>see id.</u> at 10043), attempted to initiate an interlocutory appeal, (ER2 at 02896-933), which was also denied, (<u>see id.</u> at 13975), and asked for reconsideration of the denial of appeal, (<u>see id.</u> at 13978-4010), which, again, was denied. (<u>See id.</u> at 14032-33).  Finally, the Trustee filed a motion <u>in limine</u> seeking to preclude appellees

1    from introducing any evidence to challenge avoidability and requesting that the court enter a

2    liability judgment against appellees. (See id. at 06961-95). Therein, she argued that the stipulated

3    judgment conclusively avoided the transfer, even though the bankruptcy court had already

4    explicitly decided that issue against the Trustee in its order on her motion for partial summary

5    judgment. (See ER1 at 08701-09).

6         Dye and Weinstein contend that the motion in limine was not frivolous because the law of

7    the case doctrine only applies to appellate judgments. (See, e.g., Weinstein Opening Brief at 14)

8    ("Thus, there was no appellate ruling that became law of the case, and the doctrine does not

9    extend to issues an appellate court did not decide."); (id. at 16-17) ("[T]he law of the case doctrine

10   is inapplicable here because no **appellate court** has held that [appellees] could ignore the

11   [stipulated judgment] as if it did not exist, and relitigate avoidability of the $9M Transfer.")

12   (emphasis in original).  Appellants' contention is unpersuasive.  By its own terms, the doctrine

13   provides that "a court [will not] reexamin[e] an issue previously decided by the same or higher

14   court, in the same case."  Jingles, 702 F.3d at 499 (emphasis added).  Indeed, the Ninth Circuit

15   has held that "[i]ssues that a district court determines during pretrial motions become law of the

16   case."  Smith, 389 F.3d at 949 (internal quotation marks and citation omitted); see Pit River, 30

17   F.3d at 1097 (noting that the "argument that the law of the case doctrine does not apply to

18   interlocutory orders which are not immediately appealable is meritless").

19        Dye and Weinstein also contend that because an "order denying a motion for summary

20   judgment is generally interlocutory and subject to reconsideration by the court at any time," (see

21   Weinstein Opening Brief at 14) (quoting Preaseau v. Prudential Ins. Co. of Am., 591 F.2d 74, 79-

22   80 (9th Cir. 1979), filing the motion in limine was proper.  However, the fact that a court may

23   reconsider its own interlocutory rulings at any time prior to judgment, see Smith, 389 F.3d at 949,

24   does not mean that a party may continue to request reconsideration after the court has already

25   entertained and denied the same party's previous motion for reconsideration.  "The federal rules

26   do not provide for a motion requesting a reconsideration of a denial of a reconsideration.  Were

27   such motions permitted, it is conceivable that a dissatisfied litigant could continually seek

28

33

1  reconsideration and prevent finality to the judgment." <u>Benson v. St. Joseph Reg'l Health Ctr.</u>, 575

2  F.3d 542, 547 (5th Cir. 2009), <u>cert.</u> <u>denied</u>, 130 S.Ct. 1507 (2010) (internal citation omitted).

3       Citing <u>Andrews Farms v. Calcot, Ltd.</u>, 693 F.Supp.2d 1154, 1164-65 (E.D. Cal. 2010), Dye

4  and Weinstein assert that "[d]enial of summary judgment is not a final disposition of any issue and

5  does not become the 'law of the case.' " (Weinstein and Dye's Reply Brief in Case No. ED CV 13-

6  0114 ("Weinstein Reply") at 2).   Appellants' assertion is unpersuasive.   In <u>Andrews Farms</u>, the

7  plaintiff argued that several statements from the court's earlier order denying the defendant's

8  motion for summary judgment constituted "findings" that could be used to support the plaintiff's

9  own motion for summary judgment under the law of the case doctrine.   <u>See</u> 693 F.Supp.2d at

10  1163-65.   The court disagreed, stating that "[a] denial of a summary judgment motion does not

11  constitute a final disposition of any issue in the case and does not become the 'law of the case.'

12  " <u>Id.</u> at 1164.   There, however, the previous summary judgment order had held only that the

13  defendant "failed to carry its burden to establish its claims." <u>Id.</u> at 163.   This is not the same as

14  a ruling that the defendant was incorrect on the law.   The distinction becomes clear when

15  reviewing the language of the case that the <u>Andrews Farms</u> court relied on, <u>Dessar v. Bank of Am.</u>

16  <u>Nat'l Trust and Sav. Ass'n.</u>, 353 F.2d 468 (9th Cir. 1965):

17           There is no merit in appellant's claims that the denial of appellee's first

18           motion for summary judgment was a ruling that the trust is invalid, or that

19           such a ruling is the law of the case.   The order does not purport to decide the

20           question.   It merely denies the motion because, in the court's then view, there

21           were 'issuable facts.'   Such a denial merely postpones decision of any

22           question; it decides none.   To give it any other effect would be entirely

23           contrary to the purpose of the summary judgment procedure.   The court did

24           nothing more than it purported to do, that is, refuse to grant the motion.

25  <u>Id.</u> at 470.   In <u>Dessar</u>, the court denied the first motion for summary judgment because there were

26  triable issues of fact and did not purport to make a legal ruling that the trust was invalid.   <u>See id.</u>

27       In contrast, the bankruptcy court here made a legal ruling that appellees had a due process

28  right to contest avoidability.   <u>See</u> <u>Flashcom</u>, 361 B.R. at 525 ("I conclude that Respondents have

34

a constitutional right to defend the § 547(b) claim asserted against them before they can be deprived of the value of the property transferred under § 550(a).").  That the issue was decided in the context of a denial of a motion for summary judgment does not mean that the law of the case doctrine is inapplicable.[18]  The doctrine requires only that "the issue in question [was] decided explicitly or by necessary implication in [the] previous disposition[,]" Jingles, 702 F.3d 499 (internal quotations and citation omitted), which was done here.  Further, the doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 815-16, 108 S. Ct. 2166, 2177 (1988) (citation omitted) (emphasis added).

In another bankruptcy-related case, the district court held that a legal finding in the context of a summary judgment denial constituted the law of the case.  See Mann v. GTCR Golder Rauner, L.L.C., 483 F.Supp.2d 864, 875-76 (D. Ariz. 2007).  In Mann, a bankruptcy trustee and the debtor's former employees brought an action against a former officer of the company, alleging, among other claims, a breach of fiduciary duty.  See id. at 867.  At the same time, an adversary proceeding alleging, among other claims, a preferential transfer in violation of § 547, was pending before the bankruptcy court.  See id. at 875.  The trustee moved for summary judgment in the bankruptcy court on her preferential transfer claim against the officer defendant, but the bankruptcy court denied the motion because it found that the officer was not an "insider" within the meaning of § 547.[19]  See id.

---

[18]   Some motions for summary judgment are denied because issues of material fact exist, or the party making the motion has not carried its burden, while other motions for summary judgment are denied because the court has determined that, even though no facts are in dispute, the party moving for summary judgment is wrong on the law.  For example, in a negligence case, the defendant might move for summary judgment and argue that the facts were undisputed and that he had no duty of care to the plaintiff as a matter of law.  However, the court may look at the same undisputed facts and deny the motion for summary judgment because as a matter of law, the defendant did have a duty of care to the plaintiff.  The court's legal determination that a duty of care existed would become the law of the case regardless of the fact that the court made that legal determination while denying, rather than granting, a motion for summary judgment.

[19]   A transfer is only avoidable under § 547 if it occurred within 90 days of the filing of the bankruptcy petition, except that the time limit is extended to one year prior if the transfer was made to an insider.  See 11 U.S.C. § 547(b)(4).

1    The officer moved for summary judgment in the district court case prior to the issuance of

2    the bankruptcy court's order.  See Mann, 483 F.Supp.2d at 875.  In her opposition relating to the

3    breach of fiduciary duty claim, the trustee argued that the same conduct described in her motion

4    for summary judgment before the bankruptcy court (fraudulent transfer and preferential transfer

5    of the assets of the insolvent company) constituted a breach of fiduciary duty because the officer

6    was an insider.  See id.  After her opposition was filed, the bankruptcy court issued its order

7    denying summary judgment.  See id.  The district court, in its own summary judgment order,

8    clarified that because of the bankruptcy court's finding, "[t]o the extent the trustee contends that

9    [the officer] breach his fiduciary duties because he engaged in a preferential transfer in violation

10   of section 547, the law of the case doctrine . . . forecloses this argument."  Id. at 876.  In short, it

11   is clear that the denial of a summary judgment motion can create law of the case on specific

12   issues, and Dye and Weinstein's argument to the contrary is not persuasive.

13          Dye and Weinstein also assert that they are "entitled to learn the reasoning behind why

14   th[eir] argument [relating to the Avoidance Judgment] was being rejected, in a reasoned colloquy

15   among court and counsel."  (Weinstein Reply at 1); (see id. at 7) ("[The bankruptcy court] did not

16   explain how [it] could ignore orders already made in the case, especially an indisputably final

17   judgment of avoidance.  Over the next few years, the Trustee attempted to get an answer to this

18   most pertinent question.").  In other words, Weinstein and Dye contend, in effect, that they are

19   entitled to file as many motions as they want to file until they "get an explanation" with which they

20   are satisfied.  (See Weinstein Reply at 7-8).

21          Appellants' contention is belied by the record and is not well-taken.  The bankruptcy court

22   provided more than adequate explanation for its decision, as it devoted more than eight pages in

23   its summary judgment order to analyzing the very issue with which appellants are concerned.

24   (See ER1 at 08701-09).  Just because appellants are dissatisfied with the bankruptcy court's initial

25   decision does not mean that the court did not provide an explanation or that appellants may seek

26   to revisit that ruling until – if ever – they get the ruling they want.  As the bankruptcy court stated,

27   "[l]itigation is not a game of Whac-A-Mole, where a litigant gets to keep filing motions until she gets

28   the results she wants[.]"  (Court's Order of October 11, 2012, at 15).

What's more, even assuming the bankruptcy court had not provided, as appellants contend, an explanation for its decision, appellants have not pointed to any authority that requires a bankruptcy court to provide an explanation for its decision; nor could it, for a simple one-line order denying appellants' motion for partial summary judgment would have been sufficient. "[T]he law of the case [doctrine] turns on whether a court previously 'decide[d] upon a rule of law' . . . not on whether, or how well, it explained the decision." Christianson, 486 U.S. at 817, 108 S. Ct. at 2178 (quoting Arizona v. California, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391 (1983)).

Prior to the Trustee filing the motion in limine on September 2, 2008, the bankruptcy court discussed the effect of the court's previous ruling at a pretrial conference on June 3, 2008. The bankruptcy court noted that the ruling was made following "the parties and the Court spending time and effort to litigate those matters, and there doesn't seem to be . . . an efficient use of judicial resources having to revisit those issues unless there's a good reason to do so." (ER1 at 20527). Heedless of this warning, the Trustee filed the motion in limine requesting that the bankruptcy court reconsider its previous ruling. The motion raised no new evidentiary issues, (see Court's Order of October 11, 2012, at 8), and pointed to no change in controlling law. (See, generally, id. at 06961-91). After filing a motion for reconsideration and seeking an interlocutory appeal on the Trustee's argument that the stipulated judgment avoided the transfer, the Trustee's remedy was this appeal, not a fifth attempt to relitigate the issue, albeit in the form of a motion in limine.

In Nugget Hydroelectric, L.P. v. Pac. Gas and Elec. Co., 981 F.2d 429 (9th Cir. 1992), cert. denied, 508 U.S. 908 (1993), the plaintiff filed a motion to compel when the defendant objected to the plaintiff's discovery requests. See id. at 438. The court denied the motion, finding that the requests were unnecessarily burdensome and overly broad. See id. at 438-39. The plaintiff filed a second motion to compel, and the court imposed sanctions under Rule 11 because the second motion to compel "largely duplicated" the first motion to compel. Id. at 439. The Ninth Circuit held that the lower court did not abuse its discretion. Id.; see Pipe Trades Council of N. Cal., U.A. Local 159 v. Underground Contractors Ass'n of N. Cal., 835 F.2d 1275, 1280-81 (9th Cir. 1987), opinion amended on denial of r'hng, 1988 U.S. App. LEXIS 19508 (affirming Rule 11 sanctions where

1  party filed second and nearly identical motion to compel arbitration after the initial motion was

2  denied and pending appeal).

3        The same result follows here.  The Trustee filed a motion for summary judgment, which was

4  denied.  She later filed the motion in limine, with arguments that "largely duplicated" the arguments

5  made in her motion for summary judgment and associated papers.  (Compare ER1 at 07287-304

6  and 07921-35 with ER2 at 06961-91).  Indeed, this is an even stronger case for sanctions because

7  the Trustee also filed a motion for reconsideration, which was denied, but in Nugget, the plaintiff

8  never sought reconsideration.  See Nugget, 981 F.2d at 439.  Dye and Weinstein attempt to

9  distinguish Nugget by arguing that "[d]enial of a motion to compel is not the same as forcing a trial

10  over a closed issue."  (Weinstein Reply at 9).  This is a meaningless  distinction that does not

11  address the principle at work here, which is that relitigation of an issue that has already been

12  decided without any new facts or law can justify sanctions.  Further, the bankruptcy court was not

13  "forcing a trial over a closed issue" because it had already determined that the avoidance issue

14  was not closed.  In short, the motion in limine was frivolous.[20]

15        B.    Improper Purpose

16        "An attorney files a paper for an improper purpose if he or she files it to harass or to cause

17  unnecessary delay or needless increase in the cost of litigation."  Brooks-Hamilton, 400 B.R. at

18  252 (internal quotation marks and citation omitted).  Dye and Weinstein assert that "[t]here is no

19  evidence here that the Trustee's Motion in Limine was filed to be vindictive, harassing or in

20

21      [20]  The Trustee cites cases holding that "seeking reconsideration is not, in and of itself,
   sanctionable."  (Weinstein Opening Brief at 20) (citing Big Bear Lodging Ass'n v. Snow Summit,
22  Inc., 182 F.3d 1096, 1105-06 (9th Cir. 1999) and U.S. ex rel. Robinson Rancheria Citizens Council
   v. Borneo, Inc., 971 F.2d 244, 254 (9th Cir. 1992)).  However, in Big Bear, the motion for
23  reconsideration was merely an attempt to clarify whether the plaintiff's state law claims were
   included in a dismissal order.  See Big Bear, 182 F.3d at 1105-06.  In Robinson, the district court
24  invited the plaintiff to file a motion for reconsideration when it dismissed the claims, and then
   imposed sanctions because of that motion.  See Robinson, 971 F.2d at 254.  Neither case
25  involved a party – such as appellants – that continued to raise the same arguments after a motion
   for reconsideration was denied.  Moreover, the Ninth Circuit has affirmed orders imposing
26  sanctions based on motions for reconsideration.  See, e.g., Maisonville v. F2 Am., Inc., 902 F.2d
   746, 749 (9th Cir. 1990), cert. denied, 498 U.S. 1025 (1991) (affirming sanctions where the motion
27  for reconsideration was "factually frivolous").
28

1    retaliation of anything," (Weinstein Opening Brief at 24) and that by filing the motion in limine, they

2    "attempted to right a wrong" created by the bankruptcy court's order denying summary judgment

3    and refusal to reconsider its decision. (Id. at 21-22). Appellants' assertions are unpersuasive.

4        As discussed above, see supra at § I., there was no wrong to right, but even if there was,

5    the proper vehicle to do so was a direct appeal to this court; it was not to embark on a relentless

6    quest to burden the bankruptcy court and opposing counsel with the same challenge over and

7    over again. Appellants' conduct was particularly egregious given that the motion in limine was

8    their third formal motion filed in the bankruptcy court seeking the very same relief.[21] See Robinson

9    v. City of San Bernardino Police Dept., 992 F.Supp. 1198, 1208 (C.D. Cal. 1998) (plaintiff

10   sanctioned under Rule 11 for filing a motion to harass and needlessly increase the cost of

11   litigation). As the bankruptcy court noted, the Trustee "sought a third bite at the apple with this

12   motion, which was really a second reconsideration motion, forcing [appellees] to defend it again

13   and again – after defending the original motion, reconsideration of that ruling, an interlocutory

14   appeal, and reconsideration of the dismissal of the interlocutory appeal." (Court's Order of

15   October 11, 2012, at 12-13).

16       Dye and Weinstein also contend that the motion did not cause delay, because while it was

17   set for hearing at the opening of trial, the motion was not ruled upon until after the trial. (See

18   Weinstein Opening Brief at 24-25). However, appellees could not have known at the time that the

19   motion would not be ruled upon, and were forced to spend time and effort preparing to defend,

20   once again, against the Trustee's argument that the transfer was already conclusively avoided.

21

22

---

23   [21] Dye and Weinstein's reliance on Conn v. Borjorquez, 967 F.2d 1418 (9th Cir. 1992), to
24   assert that "Rule 11 should not be applied in a way that chills an attorney's enthusiasm or
     creativity in pursuing factual or legal theories[,]" (Weinstein Opening Brief at 22), might carry some
25   weight if any new evidence or case law (that was not previously available) had been presented
     to the Bankruptcy Judge. In any event, Conn is inapposite because in that case, "[e]ach motion
26   was based on a new issue," and the court found that the sanctioned attorney "owed a duty to her
     client to continue to press for reconsideration as long as the district court continued to change the
27   basis of its ruling and as long as her arguments were soundly based in fact and in law." 967 F.2d
     at 1421. Here, in contrast, the court never changed the basis of its ruling, and the duplicative
28   motions argued the exact same issue.

1    Surely Dye and Weinstein knew that the motion in limine would be a distraction from appellees'

2    trial preparation on the remaining issues.

3          Dye and Weinstein argue that "motions in limine under some circumstances *are* the proper

4    vehicle to limit evidence on issues that can be decided as a matter of law prior to trial[.]"

5    (Weinstein Opening Brief at 22-23) (italics in original) (citing United States v. Santiago-Godinez,

6    12 F.3d 722 (7th Cir. 1993), cert. denied, 511 U.S. 1060 (1994)).  Even assuming this court was

7    bound by the Seventh Circuit's Santiago-Godinez decision, the case is inapposite as it does not

8    involve the use of a motion in limine to raise an issue that had previously been decided by the

9    court.  In Santiago-Godinez, the district court granted the government's motion in limine to exclude

10   evidence of entrapment from the trial because the proffered evidence did not establish entrapment

11   as a matter of law, and the Seventh Circuit held that the district court had not erred in granting the

12   motion in limine.  See id. at 724-25 & 730.  Unlike the motion in limine here, which was simply

13   another motion for reconsideration, the entrapment defense at issue in Santiago-Godinez had not

14   previously been ruled on by the trial court.  See id. at 724-25.

15         Even if the evidence of improper purpose is not as strong as the evidence that the motion

16   was frivolous, the two are evaluated on a sliding scale.  See Silberkraus, 336 F.3d at 870 ("[W]e

17   must consider both frivolousness *and* improper purpose on a sliding scale, where the more

18   compelling the showing as to one element, the less decisive need be the showing as to the other.")

19   (italics in original).  Indeed, frivolousness alone can be decisive.  See Grantham Bros., 922 F.2d

20   at 1441 ("[E]ither prong is alone sufficient to warrant a sanction[.]").  While "[i]nvocation of a federal

21   court's inherent power to sanction requires a finding of bad faith[,] . . . [t]he imposition of Rule 11

22   [and thus Rule 9011] sanctions, on the other hand, requires only a showing of objectively

23   unreasonable conduct."  Deville, 361 F.3d at 548 (quoting Fellheimer, Eichen & Braverman v.

24   Charter Techs., 57 F.3d 1215, 1225 (3d Cir. 1995)) (internal citations omitted).

25         Here, the court is persuaded that the bankruptcy court did not abuse its discretion in

26   imposing sanctions against Weinstein and Dye.  Dye and Weinstein knew or should have known

27   that the motion in limine was barred by the law of the case and therefore frivolous.  After the

28   bankruptcy court's in-depth analysis of the avoidability-defense issue in its order denying summary

judgment, the denial of the motion for reconsideration, and the court's warning at the pre-trial conference, it should have been obvious to appellants that the bankruptcy court would not re-visit its ruling again.  The attempt to relitigate this issue for a third time in the bankruptcy court (and twice in this court) during the time period that appellees were supposed to be preparing for trial is evidence of an improper purpose in filing the motion.

        C.     Amount of Sanctions.

       The bankruptcy court imposed $60,000 in sanctions, jointly and severally, against Dye and Weinstein.  (See Court's Order of October 11, 2012, at 14).  Under Rule 9011, sanctions may include "an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation."  Fed. R. Bankr. P. 9011(c)(2).

       Appellants raise a few arguments challenging the amount of the sanctions award.  (See Weinstein Opening Brief at 26-28).  First, appellants assert, citing Fed. R. Bankr. P. 9011(c)(1)(A), that sanctions "should be limited to the consequential expenses and attorney's fees, *i.e.*, those incurred 'because' of the paper filed in violation."  (Weinstein Opening Brief at 27); (see also id. at 28).  However, this argument is itself sanctionable as it ignores the plain language of Rule 9011, which expressly provides that when a party brings a motion for sanctions, "the court may award to the party prevailing on the motion the reasonable expenses and attorney's fees incurred in presenting or opposing the motion."  Fed. R. Bankr. P. 9011(c)(1)(A); see In re Cascade Energy & Metals Corp., 87 F.3d 1146, 1151 (10th Cir. 1996) (affirming bankruptcy judge's sanctions order where attorney was sanctioned for misquoting statute); see also Margolis v. Ryan, 140 F.3d 850, 855 (9th Cir. 1998) (holding that "the district court did not err by including in the amount awarded the costs and fees borne by defendants-appellees in bringing the motion for sanctions).

       Second, appellants contend that there is no "basis in the record" to support the sanctions amount of $60,000 imposed by the Bankruptcy Judge.  (See Weinstein Opening Brief at 26-27).  On the contrary, the record supports a much higher sanctions amount.  Appellees presented evidence that they incurred attorney's fees in the amount of $35,183 in connection with the motion in limine, plus $61,864 in connection with the motion for sanctions, for a total of $97,047.  (See ER2 at 09028-85).  "When the sanctions award is based upon attorney's fees and related

1    expenses, an essential part of determining the reasonableness of the award is inquiring into the

2    reasonableness of the claimed fees."    In re Yagman, 796 F.2d 1165, 1184-85 (9th Cir. 1986),

3    amended on denial of r'hng, 803 F.2d 1085 (9th Cir. 1986).   "The 'lodestar method' is the

4    fundamental starting point in determining a 'reasonable attorney's fee[.]' "  Christensen v.

5    Stevedoring Servs. of Am., 557 F.3d 1049, 1053 (9th Cir. 2009).  The lodestar is "determined by

6    multiplying the hours spent on a case by a reasonable hourly rate of compensation for each

7    attorney involved."  Pennsylvania v. Del. Valley Citizens' Council for Clean Air, 478 U.S. 546, 563,

8    106 S.Ct. 3088, 3097 (1986).

9         Appellees' counsel expended a total of 216.4 hours on both opposing the motion in limine

10   and prosecuting the motion for sanctions, at a blended hourly rate of $448.46. (See Court's Order

11   of October 11, 2012, at 16).  The hourly rate of attorneys ranged from $180 to $810.  (See id.).

12   The bankruptcy court found that "[t]he hourly rates and the blended hourly rate for their attorneys

13   . . . seem reasonable given the size and complexity of the case" and that "the number of hours

14   expended by counsel for [appellees] appear to be reasonable."  (Id.).  The bankruptcy court further

15   found that it was "clear" that appellees' counsel "had to conduct a large amount of research in

16   order to . . . address the myriad arguments in the motion in limine . . . and to respond to [the

17   Trustee's] vigorous opposition to the motion."  (Id. at 16-17).  Indeed, the motion in limine was not

18   a simple evidentiary issue; it essentially sought a near-automatic judgment of $9,000,000 against

19   appellees.  Viewed in that context, the bankruptcy court's conclusion that $97,047.00 in attorney's

20   fees was reasonable is entitled to substantial deference.

21        Nevertheless, the bankruptcy court decided to reduce the award from the $97,047 lodestar

22   amount to $60,000 because it concluded that $60,000 was sufficient to deter similar conduct in

23   the future.[22]  (See Court's Order of October 11, 2012, at 15) ("There is a need for deterrence here

24   _____

25        [22]   Dye and Weinstein assert that "[t]here is no rational connection between a $60,000
     punishment and deterring action in a case that is now over[.]" (Weinstein Opening Brief at 26).

26   However, Rule 9011 clearly contemplates sanctions that deter conduct not only in the case at
     issue, but also conduct "by others similarly situated."  Fed. R. Bankr. P. 9011(c)(2).  The

27   bankruptcy court intended to "deter similar conduct by [the Trustee] and [her] counsel in the
     future." (Court's Order of October 11, 2012, at 17).  Moreover, the case was not "over" when, prior

28   to the trial, appellees filed their motion for sanctions, (see ER2 at 08144-62), and at the Trustee's

1  to restrain overzealous litigants and counsel who persist in their efforts to bypass the law of the
2  case[.]"); see Fed. R. Bankr. P. 9011(c)(2).  The court agrees with the bankruptcy court that the
3  Trustee was "legally justified to litigate the issue in [the bankruptcy] court once on her original
4  summary judgment, and perhaps twice upon reconsideration," but that "thrice in [the bankruptcy]
5  court on [the Trustee's] motion in limine is vexatious."  (See Court's Order of October 11, 2012,
6  at 15).

7       In any event, appellants challenge to the $60,000 amount as a "random, lump-sum award
8  [that] contravenes the policy of deterrence that underlies Rule 11," (Weinstein Opening Brief at
9  26), is plainly without merit; they can hardly complain that the award is a "round number figure,"
10  (see id.), when it represents a reduction from an amount that the bankruptcy court found to be
11  reasonable.[23]  See In re Spectee Group, Inc., 185 B.R. 146, 160 (S.D.N.Y. 1995) (noting that
12  sanctions in the lodestar amount are "typical").  In short, the bankruptcy court's order imposing
13  sanctions of $60,000 on Dye and Weinstein was not an abuse of discretion.[24]

14                                  **CONCLUSION**

15       Based on the foregoing, IT IS ORDERED THAT:

16       1.  The Bankruptcy Court's Orders of July 28, 2004, February 5, 2007, and September 23,
17  2011, in Case No. SA CV 11-1883, are **affirmed**.

18  / / /

19

20  _____

21  request, the bankruptcy court deferred consideration of the motion.  (See id. at 08610).

22  [23]  Arguably, the only error made by the bankruptcy court was reducing the lodestar to $60,000.
23  Under the circumstances, there appears to be nothing inherently excessive in the bankruptcy
    court's determination that the requested amount of $97,047 was reasonable.  See, e.g., First Bank
24  of Marietta v. Hartford Underwriters Ins. Co., 307 F.3d 501, 509-10 (6th Cir. 2002) (affirming total
    award of $112,582.89, where $49,395.76 was in connection with time expended on filing the
25  motion for sanctions); View Engineering, Inc. v. Robotic Vision Sys., Inc., 208 F.3d 981, 987-88
    (Fed. Cir. 2000) (affirming $97,825.48 sanctions award).

26  [24]  Dye and Weinstein also argue that the bankruptcy court erred in holding Dye personally
27  liable for the sanctions award.  (Weinstein Reply at 13).  "[H]owever, this argument is waived
    because they raised it for the first time in the reply brief."  United States v. Chao Fan Xu, 706 F.3d
28  965, 983 n. 4 (9th Cir. 2013) (citing Bazuaye v. I.N.S., 79 F.3d 118, 120 (9th Cir. 1996)).

1    2.   The Bankruptcy Court's Order of October 11, 2012, in Case No. ED CV 13-0114, is

2   **affirmed**.  Weinstein and Dye shall pay the $60,000 sanctions amount no later than ten days from

3   the filing date of this Order.

4   Dated this 4th day of December, 2013.

5

6                                                              /s/

7                                                       Fernando M. Olguin
                                                    United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

44